Appellant, Charles Edward Owens, was indicted by the Spring 1982 term of the Russell County Grand Jury for the capital murder of Rebecca Heath. The indictment alleged that Mrs. Heath was murdered during a kidnapping in the first degree, in violation of § 13A-5-40 (a)(1), Code of Alabama 1975. At the guilt finding phase of appellant's trial, a jury found him guilty as charged. At the sentence determining phase, the jury (nine voting for life imprisonment without parole and three voting for death) recommended that appellant be sentenced to a term of life imprisonment without parole. A presentence report was prepared by the State probation and parole officer and a hearing was held to resolve any factual disputes concerning the contents of that report. Subsequently another hearing was held before the trial judge in accordance with § 13A-5-47. The trial judge, after consideration of the jury's recommendation, determined that the aggravating circumstances outweighed the mitigating circumstances to the extent that the jury recommendation should not be followed. Appellant was sentenced to death by electrocution. The written findings of the trial court are attached to this opinion as Exhibit A. The trial and sentencing proceedings were conducted in accordance with Beckv. State, 396 So.2d 645 (Ala. 1980), and §§ 13A-5-45 through13A-5-52, Code of Alabama 1975.
On August 31, 1981, Mrs. Heath's body was found in a green Oldsmobile Cutlass automobile, which was located approximately *Page 4 
fifty feet off an old logging road (referred to as Old Smokey Road), against some pine trees, in Troup County, Georgia. An autopsy indicated that Mrs. Heath died as a result of a bullet wound to the head. The bullet entered Mrs. Heath's skull through her right eye and did not exit. Mrs. Heath was nine months pregnant, and a dead male fetus was removed from her body during the autopsy.
The events leading up to the murder of Mrs. Heath began during the late spring or early summer months of 1981. Mrs. Heath had been married to Larry Heath[1] (hereinafter referred to as Heath) for approximately three years by the summer of 1981. They had one child, Hamilton, and the family resided in a subdivision south of Phenix City, in Russell County, Alabama.
Denise Paige Lambert[2] was twenty years old when she moved from Bristol, Virginia, to Columbus, Georgia, in May of 1981. She came to the Columbus area to gain experience in showing horses. Her parents provided her with money for living expenses while she resided in Columbus. Lambert met Heath during the summer of 1981, when she went to Banner Buildings, where Heath was employed, to purchase a camper top for her truck. Lambert and Heath subsequently became romantically involved. Heath told Lambert that he was married, but was seeking a divorce. Heath later told her that the divorce was final, but that Mrs. Heath would not move out of the house because she was having difficulty telling her parents that she was divorced and had lost custody of her son. This was a fabrication; Heath had never filed for divorce nor received a divorce from Mrs. Heath.
Heath accompanied Lambert to a family reunion, which was held the third weekend of August 1981. There, Heath was introduced to Lambert's parents and it was announced that Heath and Lambert would be married on October 18, 1981. Heath told Lambert that his divorce had become final on August 12, 1981. When Lambert returned to Columbus, she began making preparations for the upcoming marriage.
On Wednesday, August 26, 1981, Heath called Lambert and told her that Mrs. Heath had taken $58,000 from his bank account and given it to her father. Heath had told Lambert that he had received this money as payment for mercenary activities. Lambert later discovered that this was all untrue. This money, which did not exist, was to be used to purchase a horse farm in Tennessee after Heath and Lambert were married. Lambert stated that Heath was very upset when he told her about the money and said, "I'm going to have her killed," referring to Mrs. Heath. Lambert stated that she did not take this threat seriously, and she thought that "he was just mad and blowing off steam." On Friday, August 28, 1981, Heath told Lambert that he had found someone to do the job. Lambert stated that she did not actually believe Heath was serious until Saturday, August 29, 1981, when they went to a highway overpass in LaGrange, Georgia, where Heath stated, "I think this would be a good place for it to happen."
Jerry Heath[3] testified that his brother, Larry Heath, wanted to contact "someone to have somebody killed." Jerry sent his brother to see appellant because he thought appellant could "put him in contact with somebody." Three days later, Jerry saw his brother who told him that the man he had seen (appellant) could not help him and he was looking for someone else. Jerry said he did not know of anyone else. His brother became upset and told Jerry that he was afraid that he would lose his *Page 5 
son if he sought a divorce. One week later (the day before the murder), Jerry went to appellant's apartment to purchase some marijuana and when he arrived he saw his brother; the appellant; a man named Lumpkin; and another man in appellant's apartment. Heath had what looked like a pistol wrapped in a "baby diaper." Jerry stated, "Whatever it is ya'll are up to, I don't want no part of it," and then he departed.
Joseph Pate testified that he was visiting Heath at Banner Buildings on August 24, 1981. Pate stated that appellant walked in and Heath said he had been waiting for appellant. According to Pate, appellant and Heath walked outside to talk with two black men waiting in a white "`64 or `65" Ford Mustang automobile. Heath spoke with these men for approximately five minutes, then returned to his desk, took out a revolver, and loaded it with "jacketed hollowpoints." Heath put the gun back in his desk drawer and went back to the men in the Mustang. One of the men (not appellant) got out of the back seat and he and Heath went behind a building, out of sight. Later Heath returned and the Mustang was gone.
Sanders Williams[4] stated that appellant introduced him to Heath during August of 1981. Williams stated that he went to appellant's apartment and appellant and Greg Lumpkin[5] were present. Appellant asked Williams if he wanted to "make some money." Williams said it depended on what he wanted done. Williams, Lumpkin, and appellant went to Banner Buildings, in a white Mustang, to see Heath. Williams rode in the back seat; appellant and Lumpkin were in the front. Appellant first spoke with Heath, then Williams got out of the car and talked with Heath. Williams and Heath walked away from the car and went behind "one of those little buildings," on the Banner Buildings lot. Heath asked Williams to kill "his girlfriend." Williams responded, "I don't know man." Heath then gave Williams $100 "for good faith" and told him to "just think about it." Heath also told Williams that a gun would be supplied. Some time later appellant delivered a gun and bullets to Williams. (This was apparently the same meeting which Pate witnessed on August 24, 1981.)
Williams then accompanied appellant and Lumpkin to purchase a car. Williams did not go to the car lot. When Lumpkin and appellant returned, they had purchased an automobile, a "black Thunderbird." Williams was then supposed to drive in the Thunderbird to a LaGrange shopping mall to kill Mrs. Heath and make it look like a robbery; however, it was determined that it was too late to do the act that day.
Williams departed with the Thunderbird and drove to Alabama. He took the gun to a pawn shop and sold it for $100. The next day he took the car back to appellant. Appellant wanted the gun back also. Williams told appellant he would get the gun, but after that, Williams stayed away from appellant and had no further involvement with appellant or Heath.
Denise Lambert testified that Heath originally told her that he was going to have an "old marine buddy" come in from out of town to kill Mrs. Heath. Later Heath said that the deal with the "marine buddy" fell through and he had found someone else to do the job, but did not say who this other person was.
On Sunday, August 30, 1981, Heath asked Lambert to keep his son, Hamilton, overnight. Heath returned at 6:00 or 6:30 Monday morning and told Lambert to get Hamilton dressed and go to a service station *Page 6 
beside Banner Buildings, where he would meet them. Lambert arrived at the service station at approximately 7:00 a.m. She observed a white Mustang parked in the lot, next to Heath's green Oldsmobile Cutlass. Heath and appellant were standing between the two cars and talking.
Shortly thereafter Lambert took the passenger seat in her truck in order to tend to Hamilton and Heath drove the truck toward his residence. The Mustang and Cutlass followed behind the truck. Heath stopped the truck at the road leading to the Heath home. Heath told the driver of the Cutlass, "It's the second house on the left." The Cutlass and Mustang pulled around the truck and headed toward the Heath home.
Heath drove the truck back to Phenix City and parked at a service station. Heath said he wanted to wait and see if the "cars got out of the driveway okay." According to Lambert, the Cutlass and Mustang never came by. Heath drove the truck back toward the house and stopped at a church near the Heath home. Heath walked to the woods behind the church. When he returned he said "that they were gone."
Heath took Lambert and Hamilton back to Lambert's apartment. Prior to leaving, Heath handed Lambert "some folding money" and said, "Here, keep this for me. If they pick me up they'll take it." Lambert placed the money in an envelope and hid it. She stated that she never counted the money. Lambert then took Heath to work. From the 6:00 p.m. television newscast, Lambert learned that Mrs. Heath was dead and, for the first time, learned that Mrs. Heath was pregnant.
On that same Monday night, August 31, 1981, Lambert received the first of "many" phone calls from someone demanding payment for the job. The caller stated, "Larry got his wish; now it's time for me to get the paper." Lambert told the caller that she would have to get in contact with Heath; however, the caller continued to call Lambert throughout that night and the next day. Tuesday, September 1, 1981, Lambert drove by the Heath residence and saw cars parked at the house. She then called Heath and attempted to inform him of the phone calls she had been receiving. Evidently, there were people present whose presence precluded Heath from responding. Heath returned her call later that evening, around 10:30 or 11:00 p.m., and she told him about the calls. Heath told Lambert to arrange a meeting with the caller in a public place and to give the caller the money Heath had left with her on Monday. Lambert received no more calls that night. The next call came on Wednesday night and the caller identified himself as "Slim," an alias sometimes used by appellant. The caller stated, "My men are here. They need the money now." Lambert agreed to meet the caller at a local convenience store, around midnight.
Lambert arrived first at the convenience store and waited. She stated that "in a few minutes the same man that I had seen before talking to Larry the Monday morning, came up and asked if I had the money." When Lambert gave him the envelope, which contained the money she had been given by Heath, he insisted on counting the money and then stated, "There's fifteen more bills there, you're fifteen short." Lambert said there was nothing she could do about that; he would have to call Heath. Lambert then departed. At trial, Lambert identified this person as appellant.
Special Agent William J. Malueg, of the Georgia Bureau of Investigation, testified that as a result of statements by Lambert and Heath, he and other police officers proceeded to appellant's apartment with arrest and search warrants. Appellant was taken to the State Patrol Barracks in LaGrange and questioned about the murder of Mrs. Heath. Miranda warnings were read to appellant. Appellant responded that he understood, and according to Malueg, appeared to understand. Appellant agreed to talk with the officers, but refused to sign any waiver or any other document. Appellant originally denied any knowledge of Mrs. Heath's murder. Appellant denied knowing Heath until he was confronted by Heath at the Barracks. This *Page 7 
meeting had been arranged by the officers. Heath confronted appellant with the fact that, prior to Mrs. Heath's murder, appellant had been given $300 in partial payment for the murder. Appellant stated that this information was partially correct, but that the money was actually for another black man who was also at the apartment. Appellant then stated that Heath had given Williams $100 and a gun at Banner Buildings, days before the murder.
Heath was then taken from the room and, according to Malueg, appellant spoke much more freely. Appellant stated that he drove the Mustang and "Greg" drove the Cutlass the morning of August 31, 1981, as they followed Heath, who was driving a truck. According to Malueg, appellant stated he did not go in, or to, the Heath house, "that he only waited alongside the highway for the Heath car to come out of the subdivision." Appellant stated that he waited until the Cutlass returned and, then, he followed it toward Phenix City until he lost it in traffic; at which point he returned to his apartment. Throughout the interview, appellant denied any knowledge of what happened at the Heath home or the purpose in going to the Heath home.
Malueg stated, on cross-examination, that he found no physical evidence at the Heath home which would link appellant with the murder. There were no fingerprints found in the Cutlass, nor any other evidence to link appellant with the car. The murder weapon was never found, nor was the white Mustang.
C.L. Hudson testified that on the morning of August 31, 1981, he was preparing tree stands for deer season. Hudson observed a "light colored" Mustang "pull out" at a high rate of speed from Old Smokey Road, where the Cutlass was found. Hudson could not identify the occupants. The witness stated that he saw a green Cutlass pulled off on the left side of the road, at the edge of some woods. Hudson thought that someone might be hurt so he looked in the car and saw "a blue jean covered knee." At this point Hudson thought that the car was occupied by "high school kids" who had merely pulled off the road on the way to school. Hudson did not investigate further; he departed. A power company employee later discovered that the car contained the body of Mrs. Heath.
Robert Owen testified that he was a resident of the same subdivision in which the Heath home was located. Owen testified that on August 31, 1981, he left for work at approximately 7:15 a.m. Heath normally left for work at about the same time each day. Owen noticed that on this Monday Heath's car turned south rather than north, as they left the subdivision. The Cutlass drove to a church parking lot, just down from the intersection, and parked beside a Mustang. Although he stated that the Mustang was occupied by a black male, Owen could not positively state that Heath was driving the Cutlass.
Homer A. Davis, another resident of the subdivision, left for work at 7:15 a.m. on August 31, 1981. As he was leaving the subdivision, he noticed a car with an out-of-state tag, white with dark letters, enter the subdivision. When questioned by police, Davis initially described this vehicle as a van. From a photograph, Davis identified Lambert's truck as being similar to the vehicle he observed that morning. Lambert's truck was brown in color, with a camper affixed to the bed, and had Virginia tags, which are white with dark letters. Davis stated that the Heath car, a green Oldsmobile, pulled in behind this brown vehicle.
Appellant testified in his own defense. Appellant admitted knowing Jerry Heath for ten to twelve years. He also testified that during the first of August 1981, Jerry asked appellant if his brother had visited him. Shortly thereafter, Heath came to appellant's apartment and told appellant that Jerry said appellant may be able to help him "find someone to do something." Heath stated that he wanted "to get somebody roughed up or ripped off." Appellant told Heath that he was not "involved in stuff like that" and did not know anyone who would perform such a job.
The next week appellant and Lumpkin were driving around, and saw Williams. *Page 8 
Williams was told about Heath's "offer for easy money." The trio went to Banner Buildings, where appellant introduced Heath to Williams. Williams stated, "Well, do you want to talk about something?" Heath said, "Well, yeah." Williams got out of the car, and went with Heath behind a building, while appellant and Lumpkin stayed at the car. Heath and Williams talked for about ten to fifteen minutes. Williams returned to the car and shortly thereafter Heath brought Williams an envelope, and said to Williams, "I'll see you later." Williams told appellant that Heath would be dropping by appellant's apartment that night to give Williams more money and a gun. Appellant asked Williams what he intended to do, to which Williams responded, "Well, rip him off."
Later that night, Heath arrived at appellant's apartment with a "gun." Appellant asked what "was going on," and Heath told appellant that he had given Williams $100 and a gun to do a job. Appellant requested that Heath and Williams conduct their business elsewhere. About that time Jerry Heath arrived. Appellant told Jerry that his brother was about to "get ripped off." Jerry said, "Serves him right."
Sometime later, Williams told appellant that Heath wanted his wife "stabbed" after she went to LaGrange. Williams took the gun, brought by Heath, and told appellant that he was going to sell it. Williams was supposed to split the money from the sale of the gun with appellant, but Williams never returned.
A few days later, Heath came to appellant's apartment demanding to know why Williams "didn't do like he promised." Appellant told Heath that he had been "ripped off, he had gotten flimflammed." Heath got angry and told Williams, "It would get done even if he had to do it himself, and he was going to fix the people that set him up." Appellant stated he had nothing further to do with Heath. Appellant denied calling Lambert or meeting her at a convenience store to collect money.
 I
Appellant argues that the trial court erred in not granting his pleas of autrefois convict and former jeopardy.[6] This exact issue has been resolved in opposition to appellant's position in the recent United States Supreme Court opinion of Heath v.Alabama, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985), where it was held that "a single act constitutes an `offense' against each sovereign whose laws are violated by that act."Id. at 93, 106 S.Ct. at 440.
Appellant contends, however, that he cannot be tried for the same offense in Alabama because there existed a "compact" between Alabama and Georgia whereby it was impliedly agreed that Georgia would have exclusive jurisdiction of the case. Appellant relies on Hare v. State, 387 So.2d 299, 300
(Ala.Crim.App. 1980), and this court's recent opinion in Heathv. State, 455 So.2d 898, 900 (Ala.Crim.App. 1983), aff'd,455 So.2d 905 (Ala. 1984), aff'd, 474 U.S. 82, 106 S.Ct. 433,88 L.Ed.2d 387 (1985), which state:
 "`A conviction in one state for an act in violation of its laws is not a bar to a prosecution in another for the same act, if it violates the laws of the latter state, unless it is otherwise provided by statute, or unless by compact between the states it has been agreed that the jurisdiction shall vest exclusively in the state first apprehending and arresting accused.' 22 C.J.S. Criminal Law, Section 296 (c) (1961)." (Emphasis added.)
We have been cited to no statute, nor do we find a statute, which would vest exclusive jurisdiction of a case such as this in another state. Appellant contends that Alabama and Georgia officials worked hand in hand to allow Georgia to prosecute *Page 9 
appellant first. It is true that both Alabama and Georgia officials worked in cooperation to solve this crime; however, putting aside any question of whether the particular law enforcement officials had the legal authority to bind the State of Alabama in any kind of agreement or compact, there is absolutely no evidence that any Alabama official entered into such a compact or agreement with the State of Georgia. To the contrary, the cooperation between the states indicates a desire on the part of both to see that appellant was effectively prosecuted by both sovereigns. The facts clearly reflect that Alabama has at all times aggressively sought to prosecute those persons involved in the abduction and murder of Mrs. Heath. Appellant's assertion that a compact existed between Alabama and Georgia is wholly unsupported by the record.
 II
Appellant next argues that the trial court committed reversible error when it denied a change of venue due to prejudicial pretrial publicity. This contention is based on appellant's allegation in his brief that over 117 newspaper articles, photographs, and editorials regarding this case appeared in local newspapers between September 1981 and October 1984.
In Jackson v. State, 516 So.2d 726, 739 (Ala.Crim.App. 1985), we stated:
 "An accused is entitled to a change of venue if he can affirmatively demonstrate to the trial court that the pre-trial publicity has so saturated the community as to have a probable impact on the prospective jurors or that there is a connection between the publicity generated and the existence of actual jury prejudice. . . . Except in the situation where there has been a showing of inherently prejudicial publicity which has so saturated the community as to have a probable impact upon the prospective jurors, the trial court's primary responsibility in dealing with allegedly prejudicial pre-trial publicity is whether, as a result of such publicity, it is reasonably unlikely that the defendant can secure a fair and impartial trial."
The burden is on appellant to demonstrate that the "`trial atmosphere [was] utterly corrupted by press coverage,'" Dobbertv. Florida, 432 U.S. 282, 303, 97 S.Ct. 2290, 2303,53 L.Ed.2d 344 (1977) (quoting Murphy v. Florida, 421 U.S. 794, 798,95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975)), or that there is a connection between the publicity generated by the media and the existence of actual jury prejudice, Anderson v. State,362 So.2d 1296, 1300 (Ala.Crim.App. 1978).
 (a)
The record before us contains nothing to suggest that the media coverage was anything other than "objective, factual or that it was of the type that would inflame the community."Waldrop v. State, 459 So.2d 953 (Ala.Crim.App. 1983), aff'd,459 So.2d 959 (Ala. 1984), cert. denied, 471 U.S. 1030,105 S.Ct. 2050, 85 L.Ed.2d 323 (1985). See also Gray v. State,56 Ala. App. 131, 319 So.2d 750 (1975). Proof of the mere fact that there has been widespread media coverage of a case does not amount to a "showing of inherently prejudicial publicity which has so saturated the community as to have a probable impact upon the prospective jurors." Jackson, 516 So.2d at 739. See also Waldrop, supra; Thomas v. State, 452 So.2d 899
(Ala.Crim.App. 1984); Sparks v. State, 450 So.2d 188
(Ala.Crim.App. 1984).
In the case sub judice, there has been no proof of "utterly corrupted press coverage." Dobbert, 432 U.S. at 303,97 S.Ct. at 2303. Appellant has therefore, failed to demonstrate that the pretrial publicity was inherently prejudicial.
 (b)
It having been determined that the pretrial publicity was not inherently prejudicial, "there must be some showing of a connection between the publicity generated by the news articles, radio and television broadcasts, and the existence of actual jury prejudice." Anderson, 362 So.2d at 1300. See alsoDolvin v. State, 391 So.2d 666 (Ala.Crim.App. 1979), aff'd,391 So.2d 677 *Page 10 
(Ala. 1980). Appellant contends that this burden has been met by a showing that "out of 71 jurors, only 3 had not heard anything of the case." We have thoroughly reviewed the voir dire examination of each venireperson, which was conducted outside the presence of the other venire members. Eleven venirepersons were excused for cause. One member was excused on the court's motion because she had a very young child at home, which required her care. Four members were excused on motions of the State because they stated that they would not consider the death penalty under any circumstances. Six venirepersons were excused on motion of appellant. These individuals stated that they had formed opinions about the case, which they could not put aside. Three individuals had formed opinions based on what they had "heard" about the case. Venireperson Blevins had formed an opinion about Heath's guilt which could not be put aside, and for this reason the court granted the defense's challenge for cause. Venireperson Corcoron stated that she heard about the case from a "Detective Parker," and had formed an opinion based on what he had told her. Vernireperson Nelson stated that he did "not really" have an opinion, and he "supposed" he could put aside any opinion he had formed and render a verdict based on the evidence presented in court. Even though Nelson specifically stated he had no fixed opinion concerning appellant's guilt, the court granted the defense's challenge for cause. The trial court was liberal in granting the challenges requested by the defense.
Appellant correctly points out that a majority of the venire had read or heard about the murder of Mrs. Heath during the previous years in which the proceedings were pending. Each venireperson that remained on the panel after all challenges were made stated that he or she had not formed any opinion about the case and that he or she could render a verdict based on the evidence presented at trial. Most of the venire had not specifically heard of, or remembered, appellant's name from the news articles or television reports they had seen. Many of the prospective jurors could not remember the details of the incident which had been reported. We note that three years had passed since the murder, and the "passage of time cannot be ignored as a factor in bringing objectivity to the trial."Jackson, 516 So.2d at 739 (citing Robinson v. State,430 So.2d 883 (Ala.Crim.App. 1983)).
"[E]xtensive knowledge in the community of either the crime or the putative criminal is not sufficient by itself to render a trial constitutionally unfair." Dobbert, 432 U.S. at 303,97 S.Ct. at 2303. In the case at bar, the only evidence presented by appellant allegedly supporting his contention of prejudicial pretrial publicity is the fact that most of the venire had heard about the crime; such proof standing alone is not enough. Appellant has failed to show a connection between the publicity generated by the news articles and television broadcasts, and the existence of actual jury prejudice. McWilliams v. UnitedStates, 394 F.2d 41 (8th Cir. 1968), cert. denied,393 U.S. 1044, 89 S.Ct. 643, 21 L.Ed.2d 593 (1969); Jackson, supra;Nelson v. State, 440 So.2d 1130 (Ala.Crim.App. 1983); Andersonv. State, supra. The record clearly demonstrates that the venire from which the jury was drawn was not prejudiced against appellant. There has been no showing that the setting of the trial was inherently prejudicial or that the jury selection process permits an inference of actual prejudice. We, therefore, find no error in the refusal of the trial judge to grant the motion for a change of venue.
 III
Appellant contends that the State has impermissibly exercised its peremptory strikes to systematically exclude blacks from his jury. A heavy burden is placed upon an appellant when he seeks to establish purposeful invidious discrimination in this regard. The quantum of proof necessary to establish systematic exclusion of blacks from juries was set forth in Swain v.Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Appellant must marshal enough historical evidence to provide clear and convincing proof that "in case *Page 11 
after case, whatever the circumstances, whatever the crime and whoever the defendant or victim may be," id. at 223,85 S.Ct. at 837, the prosecution was responsible for the removal of blacks. See Willis v. Zant, 720 F.2d 1212 (11th Cir. 1982), cert. denied, 467 U.S. 1256, 104 S.Ct. 3546, 82 L.Ed.2d 849
(1984); May v. State, 485 So.2d 1221 (Ala.Crim.App. 1986);Jackson, supra, 516 So.2d at 762.
In the case sub judice, appellant has produced no historical data as required by Swain. Appellant, instead, urges us to adopt a method which would allow the defendant to overcome theSwain presumption (that the prosecutor is using his challenges to obtain a fair and impartial jury, 380 U.S. at 222,85 S.Ct. at 837) based entirely upon the facts of his case. Appellant relies on People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748,148 Cal.Rptr. 890 (1978), and Commonwealth v. Soares,377 Mass. 461, 387 N.E.2d 499 (1978), cert. denied, 444 U.S. 881,100 S.Ct. 170, 62 L.Ed.2d 110 (1979). We have extensively reviewed the Wheeler/Soares approach in the recent case of May v. State, supra, and expressly rejected the method proposed by appellant. We adhere to our decision in May.
Appellant contends that only twenty percent of the jury panel was black while forty percent of the county is black, and because only one black was on appellant's jury, the prosecution practiced systematic exclusion. There is "no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population."Taylor v. Louisiana, 419 U.S. 522, 538, 95 S.Ct. 692, 701,42 L.Ed.2d 690 (1975).
Appellant has failed to establish that the Russell County prosecutor impermissibly exercised his peremptory strikes to exclude black prospective jurors for the purpose of racial discrimination. There was, therefore, no error in the trial court's denial of appellant's motion to dismiss the jury based on systematic exclusion.
 IV
Appellant contends the Alabama Death Penalty Act, § 13A-5-39, et seq. is unconstitutional because it constitutes cruel and unusual punishment when the death penalty is invoked. "Appellant's contention is . . . without merit; death by electrocution does not amount to cruel and unusual punishment per se, but is a constitutional means of imposing a sentence of death." Jackson, 516 So.2d at 737. See In re Kemmler,136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890); Spinkellink v.Wainwright, 578 F.2d 582 (5th Cir. 1978), cert. denied,440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979).
Appellant next argues, without supporting data, that the Act is applied discriminatorily against certain classes of defendants. Appellant has failed to delineate how the statute is or has been applied unconstitutionally. No evidence of unconstitutional application of the statute was presented at trial or asserted in brief. No authority has been cited in brief to support this allegation. As we stated in Jackson v.State, 452 So.2d 895 (Ala.Crim.App. 1984), we disagree with the proposition asserted by appellant.
Appellant next argues, without supporting authority, that the categories of aggravating and mitigating circumstances have been applied in an unreasonable, arbitrary and capricious manner because of lack of definition and direction." Appellant fails to inform this court how the categories of aggravating and mitigating circumstances have been applied as alleged; and no evidence of unconstitutional application was presented to the trial court or asserted in brief.
Rather, the statutory scheme, itself, is designed to eliminate the possibility of the arbitrary and capricious imposition of a sentence of death. Sections 13A-5-45 through13A-5-52 provide specific guidelines to be followed in the sentencing phase, including the procedure to be followed in weighing the aggravating and mitigating circumstances. The process of weighing the aggravating and mitigating circumstances is not a mere tallying of the circumstances for numerical comparison; rather it is "a process by which circumstances relevant to sentence are marshalled and considered in an organized fashion for *Page 12 
the purpose of determining whether the proper sentence in view of all the relevant circumstances in an individual case is life imprisonment without parole or death." § 13A-5-48.
In Proffitt v. Florida, 428 U.S. 242, 258, 96 S.Ct. 2960,2969, 49 L.Ed.2d 913 (1976), the United States Supreme Court upheld the constitutionality of Florida's statutory death penalty scheme, Fla.Stat.Ann. § 921-14, which is very similar in substance to the Alabama statute. As stated in Proffitt:
 "While the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, the requirements of Furman [v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346
(1972),] are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specified factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition."
428 U.S. at 258, 96 S.Ct. at 2736. Relying on Proffitt, we perceive the Alabama statutes to be so clear and precise as to eliminate arbitrariness and capriciousness; by this scheme "the trial court's sentencing discretion is guided and channeled by a system that focuses on the circumstances of each individual homicide and individual defendant in deciding whether the death penalty is to be imposed." Id. Appellant's contention that the trial court's weighing of aggravating and mitigating circumstances lacks "definition and direction" is without merit.
 V
Appellant was charged with murder during a kidnapping in the first degree. Ala. Code 1975, § 13A-5-40 (a)(1). The State was required to prove the elements of both murder and kidnapping in the first degree, and that the murder occurred in the course of the kidnapping. Appellant contends that the State failed to prove the elements of first degree kidnapping as defined by §13A-6-43, and, therefore, that his motion for judgment of acquittal of the capital offense was due to be granted. Appellant stated in his brief that all the evidence produced by the State showed an intention to commit a murder, but not a kidnapping.
Section 13A-6-43 defines "kidnapping in the first degree" as follows:
 "(a) A person commits the crime of kidnapping in the first degree if he abducts another person with intent to
". . .
 "(3) Accomplish or aid the commission of any felony or flight therefrom; or
"(4) Inflict physical injury upon him. . . ."
The trial judge correctly charged the jury on the elements of murder, first degree kidnapping, and the capital crime of murder during a kidnapping in the first degree, as follows:
 "The charge in this indictment is a capital offense. It charges a murder during a kidnapping in the first degree; that is, for this particular offense in the indictment, there must be a murder and also a kidnapping in the first degree. They must occur with one another. If only one of the offenses has been committed, that is, either murder or kidnapping in the first degree, then the defendant cannot be convicted of the charge in the indictment.
 "A person commits the crime of murder if he causes the death of another person, and in performing the act or acts which caused the death of the person he intends to kill that person.
 "Now, a person commits the crime of kidnapping in the first degree if he abducts another person with the intent to accomplish or aid the commission of any felony, or the flight from any felony, or to inflict physical injury upon that person.
 "To sustain the charge of murder during a kidnapping in the first degree in this case, the state by the evidence must prove beyond a reasonable doubt each of the following elements of the offense of murder during kidnapping in the first degree: First, that Rebecca Heath is *Page 13 
dead; second, that the defendant, Charles Edward Owens, either himself or acting in complicity with others, caused the death of Rebecca Heath, that is, she died as a result of being shot with a gun by the defendant or by others with whom the defendant was acting in complicity with; thirdly, that in committing this act which caused the death of Rebecca Heath, the defendant did this intentionally; fourth, that Charles Edward Owens either himself or in complicity with others abducted Rebecca Heath; fifth, that he did so with the intent to thereby accomplish or aid in the commission of any felony, or the flight from any felony, or that he did so with the intent to inflict physical injury upon that person; and, sixth, that Charles Edward Owens or others with whom he may have been acting in complicity with, did not voluntarily release the victim alive and not suffering from any physical injury in a safe place prior to the apprehension of the defendant."
Appellant argues that the "mere fact of a kidnapping alone is insufficient and intent must be proved," citing Hubbard v.State, 23 Ala. App. 537, 128 So. 587 (1930). Hubbard dealt with the old kidnapping statute, § 3189, Code of Alabama 1923. This statute was recodified in Code 1940, T. 14, § 6, and Code 1975, § 13-1-23. The old statute construed in Hubbard defined kidnapping as follows:
 "Any person who forcibly or unlawfully confines, inveigles or entices away another with intent to cause him to be secretly confined or imprisoned against his will or to be sent out of the state against his will, must, on conviction, be imprisoned in the penitentiary for not less than two nor more than 10 years."
The Hubbard court stated, "The gravamen of the offense charged is the intent that Annie Belle Holmes be sent out of the state contrary to the statute against kidnapping."23 Ala. App. at 538, 128 So. at 588. The language of Hubbard has no application to the statute under which appellant in the instant case was indicted. The statute under which Hubbard was decided is no longer the law, and was not the law at the time the instant offense was committed.
The former statute, "while broadly covering any forcible confinement or enticing away, was narrowly restricted to cases where defendant intended to cause the victim `to be secretly confined, or imprisoned against his will, or be sent out of state.'" Commentary §§ 13A-6-43 and 13A-6-44. The enactment of § 13A-6-43 "substantially broadens" the former statute, Gurleyv. State, 411 So.2d 1305, 1307 (Ala.Crim.App. 1982), and imposes different proof requirements.
Pursuant to the new kidnapping statute, the State must prove two intents: The first deriving from the abduction element and the second from the statutory subdivisions of § 13A-6-43
(a)(1)-(6). The abduction element of kidnapping in the first degree is defined at § 13A-6-40 (2), as follows:
 "(2) ABDUCT. To restrain a person with intent to prevent his liberation by either:
 "(a) Secreting or holding him in a place where he is not likely to be found, or
 "(b) Using or threatening to use deadly physical force."
The trial court properly instructed the jury as to the definition of the term "abduct."
Proof of intent, necessary to convict under § 13A-6-43, "must be found by the jury and may be inferred from the facts and circumstances attending the whole transaction." Doss v. State,23 Ala. App. 168, 180, 123 So. 237, 248 (1929). In the case at bar, the State's evidence was predominantly circumstantial in nature. "A conviction may be had on evidence which is entirely circumstantial, so long as that evidence is so strong and cogent as to show defendant's guilt to a moral certainty."Tanner v. State, 291 Ala. 70, 71, 277 So.2d 885, 886 (1973). "The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude." Cumbo v. State, 368 So.2d 871, 874
(Ala.Crim.App. *Page 14 
1978), cert. denied, 368 So.2d 877 (Ala. 1979). In reviewing the sufficiency of the State's evidence of kidnapping in the first degree, we must view the evidence in the light most favorable to the State. Id.
The State's evidence clearly revealed that Heath conspired with other individuals to have his wife murdered. Evidently, there were at least two plans to have Mrs. Heath killed. Williams testified that he was supposed to abduct Mrs. Heath at a mall in LaGrange, Georgia. Williams failed to carry out the original plan and a new plan was devised.
The evidence clearly established appellant's active involvement in the kidnapping/murder. On August 31, 1981, Lambert observed appellant talking to Heath at a service station by Banner Buildings. Appellant and Heath were standing between Heath's green Cutlass, in which Mrs. Heath was later found dead, and a white Mustang in or near which appellant had been seen at various times prior to Mrs. Heath's murder. The evidence further showed that a white Mustang and Heath's Cutlass followed Lambert's truck, driven by Heath, to the Heaths' neighborhood, where Heath pointed out his house to the driver of the Cutlass. Then, the Cutlass and the Mustang went toward the Heath home. A neighbor testified that he saw a light-colored Mustang and a green Cutlass at the churchyard near the Heath home. In addition, the testimony established that at 9:15 a.m. on August 31, 1981, a light-colored Mustang was observed pulling out of the road where the Cutlass containing the body of Mrs. Heath was later found. The Mustang left at a high rate of speed. The evidence further established appellant's involvement by Lambert's testimony that, soon after the murder, she started receiving calls from someone who identified himself as "Slim," repeatedly demanding $3,000 payment "since Larry had gotten his wish"; that when Lambert informed Heath of the calls, she was instructed by Heath to arrange a meeting with the caller and to give the caller the money he had left with her; and that when Lambert arranged the meeting, appellant showed up and received the money provided by Heath. Finally, while appellant was in the custody of Agent Malueg, he made several incriminating statements. Appellant admitted driving a white Mustang the morning of the murder and following Lambert's truck to the subdivision where the Heaths lived. Although appellant denied any knowledge of the murder, his statements corroborate part of Lambert's testimony and clearly place him at or near the scene the morning of the kidnapping and murder. A reasonable inference to be drawn from the totality of this evidence is that appellant was a part of the group that conceived, planned, and executed the kidnapping and murder of Mrs. Heath.
The evidence, in addition to establishing appellant's involvement, clearly supports the conclusion that the prosecution presented sufficient proof of the elements of the offense. The evidence clearly establishes that appellant and another individual abducted Mrs. Heath from her home, forced her into an automobile (most likely by the use or threat of the use of physical force), transported her across the state line to a remote area of Georgia, and at some point fired a .32 caliber bullet into her head.
Foremost, the evidence establishes that an abduction occurred and that it occurred prior to the murder. Although no witness actually saw Mrs. Heath's abduction, circumstantial evidence clearly presented to the jury the question of whether Mrs. Heath was restrained against her will and taken from her home prior to her murder. The fact of Mrs. Heath's advanced state of pregnancy is indicative of an abduction; a jury could have reasonably concluded that it was highly improbable that she would have voluntarily traveled to an isolated area of Georgia so near her expected delivery date. We also note that when Officer Boswell proceeded to the victim's home, to locate someone to identify the body, he found the back gate ajar, the back door unlocked and an electric fan running inside the house. Boswell observed tire tracks which appeared to go down the sidewalk leading to the front door and stop at the front door. These circumstances would support a reasonable hypothesis that Mrs. *Page 15 
Heath left her home abruptly and most likely not of her own volition.
The following evidence negates the theory that no abduction occurred because the murder occurred in the home: The Heath home was thoroughly searched and no evidence was found which would support an inference that she was shot in her house. No blood was found in the home and no evidence was found which would indicate a struggle. The medical examiner examined the body of Mrs. Heath at 12:40 p.m., and placed the time of death at probably between three to four hours prior to the time of his examination. Based upon this testimony, the time of death was between 8:30 and 9:30 a.m. At the time the body was first examined at the scene, shortly after 11:10 a.m., it was still "warm under the neck, to the point that it was wet with perspiration." Neighbors observed the Cutlass and Mustang in the vicinity of the Heath home at approximately 7:15 a.m. and, at about this same time, the Cutlass was observed leaving the area. Around 9:15 a.m., the Mustang was seen leaving the area where the body was found. The Cutlass was seen parked with the motor running about twenty-five to fifty feet off the road at approximately 9:15 a.m. Mrs. Heath was found lying in the back seat in a twisted position with her head lying near the center of the seat, face down. Her body was still warm. Her feet and legs were jammed down between the rear and front seats due to the front seat being pushed as far back as it would go. There was blood on Mrs. Heath's hands, on her purse, which she was still clutching, and specks of blood on the back seat of the automobile. The only logical inference to be drawn from the evidence was that Mrs. Heath was murdered after being taken from her home.
The act of placing Mrs. Heath in an automobile and transporting her to an isolated area, across the state line, clearly supports the conclusion that appellant and his accomplice intended to prevent her liberation by secreting her or by holding her in a place where she was not likely to be found.
 "A person forcibly confined in an automobile constantly moving from place to place may be more secretly and effectively confined from the kidnapper's standpoint than one kept in a building or other place of incarceration. Common experience has shown that a victim and his kidnapper so situated can be most difficult to locate."
People v. Bishop, 1 Ill.2d 60, 64, 114 N.E.2d 566, 568, cert. denied, 346 U.S. 916, 74 S.Ct. 278, 98 L.Ed. 412 (1953).
The facts surrounding the death of Mrs. Heath, especially the evidence of the conspiracy to kill Mrs. Heath, also support the conclusion that appellant and his accomplice intended to "accomplish or aid the commission of any felony or flight therefrom," or to "inflict physical injury" upon her as the ultimate result of the abduction.
We disagree with appellant's contention that there was insufficient evidence of kidnapping in the first degree. Even if his companion was the one who actually physically seized Mrs. Heath and shot her, appellant was properly indicted and tried as a principal, though he may have been an accomplice or aider and abettor. The trial judge properly instructed the jury on the law of complicity. See § 13A-2-23, Code of Alabama (1975). "A person may be properly convicted of a capital offense if it is proven that he was an accomplice in the commission of the offense." Jackson, 516 So.2d at 759. See alsoLindsey v. State, 456 So.2d 383 (Ala.Crim.App. 1983), aff'd,456 So.2d 393 (Ala. 1984), cert. denied, 470 U.S. 1023,105 S.Ct. 1384, 84 L.Ed.2d 403 (1985). Accordingly, we find that there was sufficient evidence presented by the State to allow the jury to exclude every reasonable hypothesis except that of guilt of the capital crime charged. Appellant's motion for judgment of acquittal was properly denied.
 VI
Appellant contends that the trial court committed reversible error in overriding the jury's recommendation of life imprisonment without the possibility of parole. Appellant relies on Tedder v. State, *Page 16 322 So.2d 908, 910 (Fla. 1975), for the proposition that a trial judge may not impose a death sentence unless "the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." In Jones v. State, 456 So.2d 380, 382-83 (Ala. 1984), cert. denied, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985), the Alabama Supreme Court held that the Tedder standard is not constitutionally required. Appellant's contention to the contrary is without merit.
 VII
The scope of our review in death cases is set out in A.R.A.P. 45A, as follows:
 "In cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
We have followed this standard of review in the instant case and have found "no plain error or defect in the proceedings," either in the guilt phase or in the sentencing phase of the trial.
In reviewing appellant's death sentence by the three-tiered analysis of Beck v. State, 396 So.2d 645 (Ala. 1980), we make the following findings: First, appellant was convicted of murder during a kidnapping in the first degree, in violation of § 13A-5-40 (a)(1), Code of Alabama 1975. This offense is, by statutory definition and designation, a capital offense. Second, we take judicial notice that similar crimes are being punished capitally throughout this state. See, e.g., Callahanv. State, 471 So.2d 447 (Ala.Crim.App. 1983), rev'd. on other grounds, 471 So.2d 463 (Ala. 1985); Heath v. State,455 So.2d 898 (Ala.Crim.App. 1983), aff'd, 455 So.2d 905 (Ala. 1984), aff'd, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985);Williamson v. State, 370 So.2d 1054 (Ala.Crim.App. 1978), aff'd, 370 So.2d 1066 (Ala. 1979), vacated and remanded on other grounds, 448 U.S. 903, 100 S.Ct. 3042, 65 L.Ed.2d 1132
(1980). We note that appellant's co-defendant Larry Heath has been convicted of murder during a kidnapping in the first degree, and sentenced to death. Heath v. State, supra. Greg Lumpkin, another co-defendant, has been indicted for murder during a kidnapping in the first degree; at this time we have no information regarding the status of that case. Third, our independent weighing of the aggravating and mitigating circumstances convinces us that the sentence of death is appropriate for this appellant.
Appellant was found guilty of the capital crime, as charged, by a jury, on February 8, 1985. A sentencing hearing was held before the jury on February 12, 1985, in accordance with §§13A-5-45 and -46. The State presented no additional evidence, but relied upon the evidence presented during the guilt phase. Appellant called Dr. George C. Zubowiez, who testified that he examined appellant and observed no violent behavior and recommended that a more extensive evaluation be done. On cross-examination, Dr. Zubowiez stated that his testimony was based on an interview that lasted ninety minutes, and he had never talked with appellant before or after this interview.
Appellant next called Mr. Al Garcia, a polygraph examiner. Garcia testified that, during a polygraph examination, he asked appellant four questions concerning the murder of Mrs. Heath, and to each question appellant responded negatively. These questions were: (1) Did you personally in any way shoot and kill Rebecca Heath? (2) Were you in any way present or nearby when Rebecca Heath was shot? (3) Do you know for sure who actually shot that woman? (4) Did you in any way receive any money from Denise Lambert for any reason? According to Garcia, appellant "didn't exhibit any deception" in response to these questions. The State's cross-examination thoroughly examined the weaknesses of the polygraph.
At the conclusion of this hearing, the jury recommended a sentence of life imprisonment without parole. The trial judge ordered that a presentence report be prepared and a hearing was held on April 16, 1985, to resolve any factual disputes contained in the presentence report. See § 13A-5-47 (b). *Page 17 
The court determined sentence on April 29, 1985. This determination was conducted in conformity with § 13A-5-47. The trial court ordered and received a written pre-sentence investigation report, and after a hearing thereon, at which appellant presented evidence, the report and the evidence were made a part of the record. The trial court conducted another sentencing hearing, and the parties presented arguments concerning the existence of aggravating and mitigating circumstances and the proper sentence to be imposed. Based upon the evidence presented at trial, the evidence presented at the sentencing hearings, arguments of counsel, the presentence investigation report, and the evidence submitted in connection with it, the trial court made specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance listed in § 13A-5-51, and additional mitigating circumstances offered pursuant to § 13A-5-52. The trial court also made written findings of fact summarizing the crime and appellant's participation in it. (See Exhibit "A".) The trial court found the existence of two aggravating circumstances: (1) The capital offense was committed while the defendant was engaged in the commission of, or in an attempt to commit, kidnapping, and (2) the capital offense was committed for pecuniary gain. The trial court also found the existence of two mitigating circumstances: (1) The defendant had no significant history of prior criminal activity, and (2) the defendant exhibited no signs of deception in a polygraph examination. After weighing the aggravating circumstances and the mitigating circumstances and considering the advisory verdict of the jury, the trial court concluded that the jury recommendation should not be followed and that appellant's punishment should be fixed at death.
We find that the findings and conclusions of the trial court concerning the aggravating and mitigating circumstances were fully supported by the evidence in this case. We also find that the aggravating circumstances far outweigh the mitigating circumstances. The facts of this case disclose a deliberately planned and engineered murder. Mrs. Heath, in the ninth month of pregnancy, was abducted from the safety of her home and taken to an isolated wooded area. At some point between her home and where she was found, she was killed by a pistol shot in her eye which penetrated her brain. Her eye was apparently open when the shot was fired. The murder was committed for pay and appellant apparently received at least $1500 for committing the crime. In view of this evidence, we agree that death is the proper sentence for this defendant.
In reviewing the sentence, we are also bound by § 13A-5-53, Code of Alabama 1975. Our findings, stated above, comply with §13A-5-53 (a). In compliance with § 13A-5-53 (b), we find that: (1) There is no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) our independent weighing of the aggravating and mitigating circumstances convinces us that the sentence of death is the proper sentence in this case; and (3) considering the crime committed and the defendant, the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
We have carefully searched the complete record in both the guilt and sentence phases of appellant's trial, and we have found no error. Accordingly, appellant's conviction and sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All Judges concur.
[1] See Heath v. State, 455 So.2d 898 (Ala.Crim.App. 1983), aff'd, 455 So.2d 905 (Ala. 1984), aff'd, 474 U.S. 82,106 S.Ct. 433, 88 L.Ed.2d 387 (1985).
[2] Lambert pleaded guilty both in Troup County, Georgia, and in Russell County, Alabama, to conspiracy to commit the murder of Rebecca Heath. She was sentenced to ten years' imprisonment in Georgia, and ten years' imprisonment in Alabama, to run concurrent with the Georgia sentence.
[3] Jerry Heath pleaded guilty in Russell County, Alabama, to conspiracy to commit the murder of Rebecca Heath, and was sentenced to ten years' imprisonment. He was tried in Troup County, Georgia, for the murder of Rebecca Heath, and found not guilty.
[4] Williams pleaded guilty in Troup County, Georgia, to conspiracy to commit the murder of Rebecca Heath, and received a ten year sentence. He has been indicted in Russell County, Alabama, on a charge of murder during a kidnapping in the first degree of Rebecca Heath. At the time of appellant's trial, Williams's Alabama indictment was pending.
[5] Lumpkin and appellant were convicted in Troup County, Georgia, in February of 1982, of the murder of Rebecca Heath, and sentenced to life imprisonment. These convictions were reversed by the Georgia Supreme Court in Owens v. State,251 Ga. 313, 305 S.E.2d 102 (1983). Lumpkin was retried separately and convicted in Troup County, Georgia, of the murder of Rebecca Heath and sentenced to life imprisonment.
[6] Appellant and co-defendant Lumpkin were tried jointly in Troup County, Georgia, in February of 1982. They were convicted of the murder of Rebecca Heath and sentenced to life imprisonment. These convictions were reversed by the Georgia Supreme Court in Owens v. State, 251 Ga. 313, 305 S.E.2d 102
(1983). Appellant was retried separately in Troup County, Georgia, on April 6, 1984, and convicted of the murder of Rebecca Heath and sentenced to life imprisonment.
 EXHIBIT A STATE OF ALABAMA, Plaintiff, vs. CHARLES EDWARD OWENS, Defendant. IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA CASE NO. CC 84-455 FINDINGS AND SENTENCE BY THE COURT
The defendant, being assisted at all times by qualified counsel, was found by a jury *Page 18 
guilty of murder during kidnapping in the first degree as charged in the indictment.
 FINDINGS OF FACT FROM GUILT PHASE
Pursuant to Section 13A-5-47, Code of Alabama 1975, the Court makes the following findings of fact summarizing the crime and defendant's participation in it:
On the morning of August 31, 1981, the body of Rebecca Heath was found in a car off a rural road in Troup County, Georgia. She was nine months pregnant, and she had been fatally shot once in the right eye. The eyelid was unbroken; thus her eye was open when she was killed.
In early August, 1981, Larry Heath, the husband of Rebecca Heath, decided to have his wife killed. On August 13, 1981, he borrowed $2,516.64 from a finance company. His wife, the victim in this case, co-signed the promissory note. Part of this money was later used to pay defendant (Owens) and another man for the killing.
Heath contacted his brother, Jerry Heath, and informed Jerry of his intention to hire a person to kill his wife. Larry Heath stated he was having an affair and wanted to get a divorce, but he would not then be able to get custody of his two-year-old son. Jerry Heath said he knew someone who could arrange for Larry to meet a person who would commit the murder. Jerry directed Larry Heath to Owen's apartment in Columbus, Georgia. Larry Heath went to the apartment and told Owens of his intention.
Owens and another man, Gregory Lumpkin, were in the business together of selling drugs. Lumpkin had a Ford Mustang automobile and a .32 caliber revolver.
Later while driving in Columbus, Georgia, Owens and Lumpkin saw a person known as Sanders "Cash" Williams. Owens asked Williams if he wanted to make some money. On August 24, 1981, Owens and Lumpkin drove Williams in a white Mustang to see Larry Heath at Heath's place of employment in Columbus. Owens went inside, spoke with Heath, and took him outside to meet Williams. Williams and Heath talked privately, and Heath asked Williams to kill his (Heath's) girlfriend. He gave Williams $100.00 to prove that he was serious. Heath later took a pistol for Williams and left it at Owen's apartment. Heath had planned for Williams to shoot his wife while she was shopping in LaGrange, Georgia, and make it appear as a robbery. Williams never followed through with this plan; instead he sold the pistol, kept the money, and left the area. After Williams failed to kill Rebecca Heath, Larry Heath devised another plan, and he talked with Owens again.
Denise Lambert was the paramour and accomplice of Larry Heath. On August 29, 1981, she and Heath drove toward LaGrange, Georgia, on Highway I-185. Before reaching LaGrange, Heath selected a place in Georgia for Rebecca's body to be found in a car as though she had been killed in an accident.
In the evening of August 30, Heath brought his son to spend the night with Lambert. Between 6:00 A.M. and 6:30 A.M. on August 31, Heath came to Lambert's apartment in Columbus, Georgia. She followed his instructions and met him at his place of employment. Heath's car and a white mustang were there. After talking with Owens, Heath got in her vehicle and they led the two cars to Heath's house in Russell County, Alabama. There Heath pointed out the house to the two men in the other cars. Heath and Lambert then returned to Columbus. Later he drove to a church parking lot from which he could see his house, and he said that they were gone.
At approximately 9:15 A.M. on August 31, a person saw a car which was later identified as Heath's car off the rural road in Troup County, Georgia. He saw a light colored Mustang driving away at a high rate of speed. The person stopped at the car and through the window saw a knee. He did not investigate further. Another person stopped at 11:00 A.M., found the body and notified law enforcement officials.
After returning to Lambert's apartment on the morning of August 31, Heath had *Page 19 
given her some money with a one hundred dollar bill on top to keep in case he was arrested.
A person calling himself Slim began telephoning Lambert at her apartment, saying that Larry had "gotten his wish," and it was time to "hand over the paper." On September 1, she told Heath of the calls, and he instructed her to take the money and give it to Slim in a public place. On September 2, Slim again called and she arranged to meet him beside a gas station in Columbus, Georgia. At the station, Owens (defendant in this case) came to her car and took the money. He said he had to count it and several minutes later he returned. Owens said there were "fifteen bills there," but she was "fifteen short." Lambert said she couldn't do anything about that, and Owens left.
A nickname of the defendant, Charles Edward Owens, is Slim.
The Court finds that Rebecca Heath was abducted from her home in Russell County, Alabama for the purpose of killing her. Between her home and the place where her body was found, Rebecca Heath was murdered. There is no evidence to conclusively prove the location of the exact place that she was killed.
The Court finds that Charles Edward Owens did intentionally cause the death of Rebecca Heath by shooting her with a gun, and he caused said death during his abduction of or attempt to abduct Rebecca Heath with the intention of murdering her.
The Court finds that the defendant knowingly intended to participate in a kidnapping and murder of Rebecca Heath. He intended for that to be the end result of the criminal activity.
 FINDINGS FROM SENTENCING PHASE
After the trial a sentence hearing was held with participation by the jury. The State rested upon the evidence brought forth at the guilt phase, and defendant presented evidence by witnesses. Arguments were made to the jury by both sides. The jury deliberated after being charged by the Court, and a majority of the jurors recommended that the punishment be life without parole. Nine of the jurors voted for that sentence, and three jurors voted for death.
The Court ordered for probation officer for this circuit to prepare a written pre-sentence investigation report. This report was duly prepared and filed. Copies of the report were furnished to the counsel of both parties. A hearing was held for the parties to respond to the report and to present evidence about any part of the report which would be the subject of a factual dispute. Arguments were also made regarding the sentence that should be imposed in this case.
The Court finds from the evidence presented in the guilt phase of this trial that the defendant was guilty and is guilty of the murder of Rebecca Heath during a kidnapping in the first degree of the said Rebecca Heath. The Court finds the following aggravating circumstances exist in this case:
A. The capital offense was committed while the defendant was engaged in the commission of or an attempt to commit kidnapping.
B. The capital offense was committed for pecuniary gain.
The Court finds that the following aggravating circumstances do not exist in this case:
A. The capital offense was committed by a person under sentence of imprisonment.
B. The defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person.
C. The defendant knowingly created a great risk of death to many persons.
D. The capital offense was committed while the defendant was engaged or was an accomplice in the commission, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, or burglary.
E. The capital offense was committed for the purpose of avoiding or preventing a *Page 20 
lawful arrest or effecting an escape from custody.
F. The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
G. The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses as those terms have been defined by the appellate courts.
Upon consideration of all of the evidence brought forth at the guilt phase of the trial, the sentence hearings, and the presentence report, I find that the following mitigating circumstances exist:
A. The defendant exibited no signs of deception in a polygraph examination in which he denied committing the crime or being present when it was committed.
B. The defendant does not have a significant history of prior criminal activity as that term has been defined by the appellate courts.
The Court finds that the following mitigating circumstances do not exist in this case:
A. The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
B. The victim was a participant in the defendant's conduct or consented to it.
C. The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor.
D. The defendant acted under extreme duress or under the substantial domination of another person.
E. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
F. The age of the defendant at the time of the crime. At the time of the crime, the defendant was 31 years old.
G. There are no other mitigating circumstances that exist from the matters which were offered by defendant pursuant to Section 13A-5-52, Code of Alabama 1975.
 SENTENCE
Upon considering and weighing the aggravating circumstances and the mitigating circumstances, the Court finds that the aggravating circumstances outweigh the mitigating circumstances. In making this determination, the Court has considered the jury recommendation of life without parole. The Court finds that the aggravating circumstances outweigh the mitigating circumstances when the jury recommendation of life without parole is also taken into consideration. It is, therefore, ORDERED and ADJUDGED by the Court that the defendant be sentenced to death by electrocution as set forth in an order of sentence by this Court and as specified to be carried out by the laws of this State.
Under the sentence given here, automatic notice of appeal is entered on behalf of defendant. Counsel will be appointed to represent him on appeal. Costs are assessed against the State of Alabama.
 JUDGMENT AND ORDER OF SENTENCE
This case is before the Court for sentencing. The State is represented by its District Attorney, Kenneth Davis, and the defendant is present in open court with his counsel, James Ivins, Esq., and Michael Bellamy, Esq. The Court has previously conducted a sentence hearing with participation by the jury and a hearing for the parties to present evidence regarding matters in the contents of the pre-sentence report and for arguments to be made regarding the proper sentence in this case. Before sentence was imposed, the defendant was asked if he had anything to say as to why sentence of the Court should not be pronounced or before the sentence was pronounced. He made statements regarding the prosecution of this case, and he denied committing the offense.
Upon the jury verdict of guilty of murder during kidnapping in the first degree, the Court adjudges the defendant guilty of murder during kidnapping in the first degree, *Page 21 
that is Charles Edward Owens did intentionally cause the death of Rebecca Heath by shooting her with a gun and Charles Edward Owens caused said death during Charles Edward Owen's abduction of, or attempt to abduct, Rebecca Heath with intent to inflict physical injury upon her in violation of Section 13A-5-40
(a)(1) of the Code of Alabama 1975, as amended.
Upon consideration of the evidence in this case, the matters brought forth in the sentence hearings, and upon consideration of the aggravating and mitigating circumstances, the Court finds that the aggravating circumstances outweigh the mitigating circumstances to the extent that the jury recommendation of life imprisonment without parole should not be followed.
It is, therefore,
ORDERED BY THE COURT that the punishment in this case is fixed at death.
Pursuant to Rule 8 (d)(1) of the Alabama Rules of Appellate Procedure, the Court does not set an execution date.
It is ORDERED that the Sheriff of Russell County, Alabama, deliver the said Charles Edward Owens to the custody of the warden of the William C. Holman Unit of the State Prison System at Atmore, Alabama, together with a warrant from the clerk of this court regarding the judgment and sentence in this case.
The executioner designated by the laws of this State, at the proper place specified by law for the execution of one sentenced to death, shall cause a current of electricity of sufficient intensity to cause death to pass through the body of the defendant, with such current of electricity to be applied and to continue until the defendant, Charles Edward Owens, is dead.
The clerk of this court is ordered to issue a warrant under the seal of this court directed to the warden of the William C. Holman Unit of the State Prison System at Atmore, Alabama, which shall recite the fact of conviction and shall set forth specifically the offense and the judgment of the Court. The clerk shall deliver said warrant to the sheriff of Russell County, Alabama, who shall deliver the warrant and the defendant, Charles Edward Owens, to the warden.
Pursuant to Section 13A-5-55, the judgment of conviction is automatically reviewed. Notice of appeal is hereby entered on behalf of the defendant and the sentence herein is suspended, pending appeal.
DONE this the 29th day of April, 1985.
 /s/ Wayne T. Johnson
Circuit Judge, Russell County, Alabama