WELCH, Judge.
 

 Michael Sale was convicted of the murder of his wife, Lynn Sale, made capital because it occurred during the course of kidnapping in the first degree, a violation of § 13A-5-41(l), Ala.Code 1975. After the penalty phase of Sale’s trial, the jury unanimously recommended that he be sentenced to death. The trial court then ordered a presentence report. A sentencing hearing was held, after which the trial court accepted the jury’s recommendation and sentenced Sale to death.
 

 The evidence adduced at trial tended to show the following. On the night of May 2, 2004, Michael Sale placed a telephone call to 911 and requested help for his -wife, Lynn, at their home in Webb, Alabama. Daniel Mercer, one of the paramedics who responded to the call, said they were told the patient’s extremities were turning black.
 

 Mercer said that when paramedics arrived at the Sales’ home, they found Lynn lying in a twin bed covered with stained, dirty linens. He said that when he pulled down the bed covers to examine Lynn, the odor of urine, feces and decubiti, or dead flesh, “came up on me.” (R. 396.) Lynn’s hands and feet were black, and she was having trouble breathing. Mercer said that in his opinion, Lynn was going to die if she did not receive treatment immediately. Despite her poor condition, Mercer said, Lynn reacted to pain stimuli.
 

 Mercer said he was concerned about how Lynn had reached such a poor condition and questioned Sale as to whether Lynn had seen a doctor recently. He said that Sale told him that she had seen a doctor two weeks earlier but that the doctor did not know what was wrong with her, it may have been blood poisoning or it may have been cancer. Mercer was still puzzled, so, he said, he asked Sale three times whether Lynn had recently seen a doctor and each time Sale told him she had seen the doctor two weeks earlier. (R. 787.)
 

 Lynn was transported by ambulance to Southeast Alabama Medical Center in Do-than. Dr. Allen Purvis, one of Lynn’s treating physicians, testified that Lynn, who was 48 years old, was dehydrated and in renal failure and respiratory failure
 
 *335
 
 when she arrived at the hospital. Her extremities, as well as her nose, were turning black because she was suffering from gangrene caused by sepsis, a bacterial infection that enters the blood stream, generally through a cut or break in the skin. The infection can be the result of poor hygiene. Dr. Purvis said that if Lynn had lived, her fingers, nose, and legs below the knees would have had to have been amputated.
 

 Dr. Purvis was concerned about how bad Lynn’s condition was before she was brought into the hospital. He testified that she had to have been extremely ill for a number of days to be in as poor a condition as she was when she was first brought in. He added that he had been a physician for 16 years and he had
 

 “never had anybody bring anybody and say they stopped talking three days ago. I mean, if somebody stops talking, that is as basic as it gets. People bring them in right then. If something turns dark or black, people bring them in right then. They don’t say their foot turned black three days ago. They don’t say they stopped talking three days ago, and we decided to bring mama in today. They just don’t do that. We have never in all my time have people come in and delay that. And that is people of any low educational status, maybe somebody who is maybe mentally handicapped. You just know there is something extremely, seriously wrong when someone stops talking.”
 

 (R. 685.)
 

 Dr. Purvis said after examining Lynn, he was “fairly convinced” she had been the victim of domestic abuse. (R. 687.) She had a broken rib, black eyes and “cauliflower ear,” a term meaning her ear was swollen and misshapen from a blow. Lynn was covered in bruises, human bite marks, scratches and cuts, some of which were fresh and some of which had been healing. Lynn also had significant swelling in her genitalia and pubis region, and there were scratches on her vagina. Given Lynn’s condition, hospital personnel did not believe she was capable of having scratched herself.
 

 In addition, medical tests showed that Lynn had suffered a heart attack and several small strokes. Dr. Purvis’s opinion was that the heart attack occurred before Lynn was brought into the hospital. Based upon the results of a CAT scan, Dr. Purvis said the strokes had occurred several days before Lynn was brought to the hospital. A CAT scan also showed that Lynn had a tampon in her vagina that had been left there for a number of weeks. She was unable to move her arms and legs. He said that to be in such poor condition, she had to have been ill for some time.
 

 Dr. Purvis said that when they discovered the tampon, doctors immediately suspected that she had toxic-shock syndrome. After running tests, however, they ruled out toxic shock as a cause of Lynn’s sepsis, because blood tests revealed that the infection she had was not consistent with toxic shock.
 

 Lisa Nixon, a nurse who treated Lynn, testified that Lynn’s toes and fingers were hard and “crispy.” (R. 832 and 833.) She said that Lynn’s nose was “just like a piece of charcoal sitting up there. It wasn’t soft and mushy like a normal nose. It was hard and crispy. We were very afraid to do anything with that [feeding] tube, because we were afraid that part of the nose would fall off.” (R. 830-31.) Also, large patches of hair were missing from Lynn’s head.
 

 Nixon also testified as to the bruising and cuts Lynn had suffered. According to Nixon, Lynn was feeling pain and would
 
 *336
 
 often moan. Nixon said that although Lynn’s condition was terminal, she did improve somewhat when she was being treated at the hospital. Three days before Lynn’s death on May 17, 2004, Nixon said she was talking to Lynn as she usually did, not expecting an answer. Lynn verbally responded, which “kind of shocked” Nixon. (R. 828.) Nixon asked Lynn a series of questions such as her age, where she was, and whether she had children, all of which Lynn answered correctly. Nixon said she then asked Lynn whether she knew who had hurt her. Lynn said yes, then said, “Michael hurt me, he did this to me.” (R. 828.) Shortly afterwards, Nixon said, Lynn stopped being able to move her mouth or to open her eyes. She died three days later.
 

 Nixon also testified as to Sale’s demean- or and the inconsistent statements he made when he was at the hospital. When Lynn was first brought into the hospital, Nixon asked Sale how long Lynn had been sick. He told her it had been a couple of days. Nixon asked Sale whether Lynn had been to see a doctor. Sale said that she had and that the doctor thought she had a kidney infection. He also told Nixon that the reason he did not take her to a doctor before was that she refused to go. He then said Lynn had not been able to talk for several days. When Nixon asked him how she had refused to go to the doctor when she could not talk, Sale changed the subject.
 

 On May 3, 2004, the day after Lynn was admitted to the hospital, the hospital notified police of the possibility that she had been the victim of domestic violence. Investigator Bill Rafferty with the Houston County Sheriffs Department testified that he went to the Sales home in Webb to execute a search warrant to determine whether there was any evidence of domestic abuse at the home. In the garbage can outside of the house, they found filthy clothes belonging to Lynn. They also found wads of hair matching Lynn’s, and a handwritten note asking, “Do you hurt, yes or no.” A long strip of torn sheet, about five feet long and three inches wide was found in the shed outside the house.
 

 Inside the house, law-enforcement officials found a stained mattress on a twin bed that had been covered in baking soda, battered walls, damage to cabinets in the house, weather stripping on an interior bedroom door, blood toward the bottom of that door, and nail holes above the windows and the door framing in that bedroom. The room smelled of urine and feces. Law-enforcement officials found a pair of broken, twisted eyeglasses, and a calendar that had been torn up.
 

 Ryan Sale, Lynn and Sale’s oldest son, was 23 years old at the time of the offense. At trial, he testified as to the cause of Lynn’s critical condition and eventual death. He said that Sale often physically abused Lynn and that Sale had also hit him. He said he was so afraid of Sale that when Sale hit Lynn, he had wet his pants. He described Sale as controlling the family and said that Sale would not allow Lynn to see her sisters or her parents, all of whom lived in Michigan. Sale, who had his own floor-tiling business, also made Lynn quit her job.
 

 Ryan said that in 2000 or 2001, Lynn finally called the police to report Sale’s abuse. On April 17, 2001, Sale was convicted and sentenced to two years in prison, to be followed by five years’ probation. Sale served 11 months and then was released from prison to begin serving his probation. As a condition of his probation, Sale was subject to a restraining order that prohibited him from having any contact with Lynn, and he was not to go near her.
 

 
 *337
 
 Ryan said that when Sale got out of prison, he returned to their home, despite the restraining order. Ryan testified that he was more afraid of his father when he got out of prison. Ryan said that he heard Sale tell Lynn that he wanted to “punish her due to all the money that he lost while he was locked up and the downfall the business had taken while he was locked up.” (R. 457.) Ryan described Lynn from that point on as being “terrorized.” (R. 457.) He described the atmosphere at home as “very scared, fearful.” (R. 463.) Although Ryan knew his mother was suffering beatings at the hands of his father, he did not report his father out of fear of what Sale would do to Lynn, Ryan, and his younger brother.
 

 In late March or early April 2004, Ryan said Sale had him remove all of the telephones from the house. The first week of April, Sale moved Lynn out of their bedroom and made her stay in the recreational vehicle (“RV”) parked in their backyard. Ryan said the RV was old and had been “gutted.” (R. 467.) Lynn slept in a twin bed that had been placed in the RV. At that time, Sale never left Lynn. He even stopped working. Ryan said at that time, he was earning all of the money the family was using. When Ryan asked Sale why Lynn and Sale were staying in the RV, Sale told him they were working on their taxes.
 

 On or about April 10, 2004, Sale moved Lynn from the RV into the shop the Sales had in their backyard. Ryan did not go out to the shop to check on Lynn, and he did not know whether she was being given food or water during that time.
 

 On or about April 15 or 16, 2004, Ryan said, Sale moved Lynn back into the house, but by then, she could no longer walk. She had also lost the ability to raise her arms. Throughout the time Lynn was made to stay in the RV and the shop, Sale made Ryan keep a diary of sorts on the calendar describing Lynn’s deteriorating condition. Ryan said after his mother went to the hospital, he could not find the page of the calendar where he had kept track of her condition. When law-enforcement officials searched the house, they found a torn calendar, but they did not find the page for the month of April, which is when Ryan kept the notes.
 

 Ryan said that about eight days before Sale finally called 911, Lynn lost the ability to carry on a conversation, although she was able to moan. She eventually began to have trouble urinating. If she was moved to another room of the house, Ryan said, he and Sale had to pick her up and move her. On the occasions when he saw Sale attempt to feed Lynn, Ryan said, she was unable to keep the food down. She wore only a nightgown that was never washed.
 

 When Lynn was moved back into the house, Ryan said, Sale nailed blankets over the windows of the master bedroom, where she was staying, even though the windows already had blinds. Sale also put weather stripping on the bedroom door, an interior door, making the room even darker. Ryan and his brother were not to go into the room.
 

 Ryan also described the general condition of the house. There were holes in the walls throughout the house; Sale had ripped the oven door off; he had kicked in cabinet doors and “busted up” kitchen drawers; and he had “busted up” furniture, and a door frame. (R. 499-501.)
 

 Ryan said that Sale did not take Lynn to the doctor during this time. When Ryan saw that her nose and fingertips were turning black, he grew concerned that she might have gangrene and did research on the Internet to try to determine what was wrong with her. He told Sale that he
 
 *338
 
 believed Lynn had gangrene. When he did, Ryan said, Sale became “very erratic and scared, and that was the night he called the paramedics.” (R. 555.)
 

 Ryan also testified that Sale told him that if anyone ever questioned him about Lynn’s condition, he was to say that she fell getting out of the RV and bruised her legs, and that she got scratched when Sale tried to catch her as she fell.
 

 I.
 

 Sale contends that the State failed to present sufficient evidence to support either his conviction for capital murder or for the sentence of death imposed. Specifically, Sale says, the State failed to prove kidnapping and that he had the intent to kill or hurt Lynn. This issue was preserved for appellate review by Sale’s motions for a judgment of acquittal and for a new trial.
 

 “ ‘ “In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.” ’
 
 Ballenger v. State,
 
 720 So.2d 1038, 1034 (Ala.Crim.App.1998), quoting
 
 Faircloth v. State,
 
 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). ‘“The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.” ’
 
 Nunn v. State,
 
 697 So.2d 497, 498 (Ala.Crim.App.1997), quoting
 
 O’Neal v. State,
 
 602 So.2d 462, 464 (Ala.Crim.App.1992). ‘ “When there is legal evidence from which the jury could, by fair inference, find the defendant guilty the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court’s decision.” ’
 
 Farrior v. State,
 
 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting
 
 Ward v. State,
 
 557 So.2d 848, 850 (Ala.Crim.App.1990). ‘The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.’
 
 Ex parte Bankston,
 
 358 So.2d 1040, 1042 (Ala.1978).
 

 “ ‘The trial court’s denial of a motion for judgment of acquittal must be reviewed by determining whether there was legal evidence before the jury at the time the motion was made from which the jury by fair inference could find the defendant guilty.
 
 Thomas v. State,
 
 363 So.2d 1020 (Ala.Crim.App.1978). In applying this standard, this court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt.
 
 Willis v. State,
 
 447 So.2d 199 (Ala.Crim.App.1983). When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for acquittal does not constitute error.
 
 McConnell v. State,
 
 429 So.2d 662 (Ala.Crim.App.1983).’ ”
 

 Gavin v. State,
 
 891 So.2d 907, 974 (Ala.Crim.App.2003) (quoting
 
 Ward v. State,
 
 610 So.2d 1190, 1191 (Ala.Crim.App.1992)). See also
 
 Ward v. State,
 
 814 So.2d 899, 908-10 (Ala.Crim.App.2000). In addition, it is not the place of an appellate court to invade the province of the jury and to reweigh evidence presented at trial. See
 
 Zumbado v. State,
 
 615 So.2d 1223, 1240-1241 (Ala.Crim.App.1993).
 

 “To sustain a conviction under § 13A-5-40(a)(l), Ala.Code 1975, for the capital offense of murder during a kidnapping, the State must prove beyond a reason
 
 *339
 
 able doubt: (1) a kidnapping in the first degree, as defined by § 13A-6-43(a), or an attempt thereof; (2) an intentional murder, as defined by § 13A — 6—2(a) (1); and (3) that the murder was committed ‘during’ the course of the ‘kidnapping or attempted kidnapping.’
 

 Butler v. State,
 
 781 So.2d 994, 997 (Ala.Crim.App.2000).
 

 A person commits the crime of kidnapping in the first degree if he abducts another person with intent to inflict physical injury upon that person or to terrorize him, among other things not pertinent here. § 13A-6-43(4) and (5), Ala.Code 1975.
 

 “ ‘ “The abduction element of kidnapping in the first degree is defined at § 13A-6^10(2), [Ala.Code 1975], as follows:
 

 “ ‘ “ ‘(2) Abduct. To restrain a person with intent to prevent his liberation by either:
 

 “ ‘ “ ‘(a) Secreting or holding him in a place where he is not likely to be found, or
 

 “ ‘ “ ‘(b) Using or threatening to use deadly physical force.’
 

 [[Image here]]
 

 “ ‘ “Proof of intent, necessary to convict under § 13A-6-43 [first-degree kidnapping], ‘must be found by the jury and may be inferred from the facts and circumstances attending the whole transaction.’
 
 Doss v. State,
 
 23 Ala.App. 168, 180, 123 So. 237, 248 (1929)
 

 “
 
 ‘Owens v. State,
 
 531 So.2d 2, 13-14 (Ala.Crim.App.1986).’
 

 “Broadnax v. State,
 
 825 So.2d 134, 203 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001).”
 

 Kabat v. State,
 
 867 So.2d 1153, 1158 n. 5 (Ala.Crim.App.2003).
 

 “A person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his purpose is to cause that result or to engage in that conduct.” § 13A-2-2(l), Ala.Code 1975. Furthermore,
 

 “ ‘[t]he question of a defendant’s intent at the time of the commission of the crime is usually an issue for the jury to resolve.’
 
 Rowell v. State,
 
 570 So.2d 848, 850 (Ala.Crim.App.1990), citing
 
 Crowe v. State,
 
 435 So.2d 1371, 1379 (Ala.Crim.App.1983). Intent may be ‘“inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.” ’
 
 Jones v. State,
 
 591 So.2d 569, 574 (Ala.Crim.App.1991), quoting
 
 Johnson v. State,
 
 390 So.2d 1160, 1167 (Ala.Crim.App.), cert. denied, 390 So.2d 1168 (Ala.1980).”
 

 Butler,
 
 781 So.2d at 997.
 

 In this case, the State presented evidence that Sale sequestered Lynn in a gutted RV, in a shed, and finally in a bedroom in their house, with weather stripping on the interior door to the room and blinds and blankets over the windows. No one could see Lynn in any of the locations. Sale stayed with her 24 hours a day, seven days a week. He had his son Ryan remove all of the telephones from the house. There were times when even Ryan and his brother were not allowed to see Lynn.
 

 When Lynn arrived at the hospital, she was covered in injuries that were healing and in fresh injuries, indicating that her abuse had occurred over a period of time. Medical testimony demonstrated that the detrimental effects of the injuries she sustained were compounded not only by Lynn’s inability to clean herself or her surroundings — at the hands of Sale, but also by her weakening condition — the result of not only the abuse she was taking but also because of her lack of proper nutrition and hydration, once again at the hands of Sale.
 

 
 *340
 
 Dr. Purvis, Nixon, and Mercer, the health-care providers who treated Lynn, each testified that in their opinions, Lynn had to have been in noticeably poor condition long before Sale called 911 and Lynn was brought to the hospital. Dr. Purvis said he had never seen anyone enter the hospital in Lynn’s condition during 16 years of practicing medicine. Nonetheless, Sale did not seek medical help for Lynn until there was nothing left for doctors to do to save her life. The testimony was undisputed that Lynn was able to feel pain throughout her ordeal.
 

 The State also presented evidence indicating that the reason for Sale’s exceedingly cruel treatment of Lynn was that she had had him prosecuted for abusing her in the past. Rather than taking responsibility for his wrongful conduct, Sale blamed Lynn for causing him to lose money and business during the time he was incarcerated. Therefore, according to Sale’s son, Sale determined that Lynn had to be punished.
 

 The State presented sufficient evidence from which a jury could have reasonably determined that Sale restrained Lynn by keeping her in such a place that she was not likely to be found and that he also used force or the threat of force to keep her from getting away from him to seek help. From the horrific nature of Lynn’s condition and the evidence of Sale’s conduct, inflicting extreme injury and pain on Lynn and refusing to seek help for her until it was apparent that she was near death, the jury reasonably could have found that Sale intended not only to injure Lynn but that he also intended for her to die.
 

 There is no merit to Sale’s contention that the State failed to present sufficient evidence to sustain his conviction. We will address the sufficiency of the evidence to sustain his sentence of death as part of our review of the propriety of that sentence in the discussion in Part Y, below.
 

 II.
 

 Sale contends that the trial court erred in failing to declare a mistrial when his lead counsel fell ill during the trial. The record of the trial proceedings does not reflect the absence of Sale’s lead counsel, and the issue was not raised until Sale’s motion for new trial.
 

 To be timely, a motion for a mistrial must be made immediately after the ground for the motion becomes apparent. See
 
 Butler v. State,
 
 659 So.2d 1021 (Ala.Crim.App.1995). Sale did not move for a mistrial, and he raised the issue of whether the trial court should have declared a mistrial only after the judgment had been entered in this case. Therefore, generally we would hold that this issue was not preserved for appellate review. However, that general rule does not apply in cases involving the imposition of the death penalty.
 
 Id.
 
 Because this is such a case, we review this issue for plain error. Rule 39(a)(2)(D), Ala. R.App. P.
 

 “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in
 
 United States v. Young,
 
 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See
 
 Ex parte Price,
 
 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999);
 
 Burgess v. State,
 
 723 So.2d 742 (Ala.Crim.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct.
 
 *341
 
 1360, 143 L.Ed.2d 621 (1999);
 
 Johnson v. State,
 
 620 So.2d 679, 701 (Ala.Crim.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Crim.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
 

 Hall v. State,
 
 820 So.2d 113, 121-22 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001).
 

 Alabama law requires that “[e]ach person indicted for [a capital offense punishable by death] who is not able to afford legal counsel must be provided with one court appointed counsel having no less than five years’ prior experience in the active practice of criminal law.” § 13A-5-54, Ala.Code 1975.
 

 Sale was represented by two attorneys, both of whom, he concedes, met the requirements set forth in § 13A-5-54. Sale contends, without citing any supporting evidence, that one of his two appointed attorneys was “only counsel in a support capacity and therefore, unable to provide the counsel necessary” when the other attorney representing him was ill and unable to attend trial one day. (Sale’s brief at p. 17.) Sale fails to present evidence to support his conclusion. As mentioned, the record does not indicate when the attorney who became ill was not present, and Sale does not allege any way in which remaining counsel failed to adequately represent him.
 

 “We have held that § 13A-5-54, Ala.Code 1975, requires only that one attorney meet the statutory requirements. ‘In
 
 Parker v. State,
 
 587 So.2d 1072 (Ala.Crim.App.1991), we held that when a person accused of a capital offense has one attorney whose experience meets that required in § 13A-5-54, the requirements of that section have been satisfied.’
 
 Hodges v. State,
 
 856 So.2d 875, 899 (Ala.Crim.App.2001).”
 
 Belisle v. State,
 
 11 So.3d 256, 279 (Ala.Crim.App.2007). Furthermore, a defendant in a capital case is entitled to only one attorney with five years’ experience. See
 
 Robitaille v. State,
 
 971 So.2d 43, 51-52 (Ala.Crim.App.2005); and
 
 Whitehead v. State, 777
 
 So.2d 781, 851 (Ala.Crim.App.1999).
 

 We note that “a mistrial is a drastic remedy, to be used only sparingly and only to prevent manifest injustice.”
 
 Ex parte Thomas,
 
 625 So.2d 1156, 1157 (Ala.1993). Sale was represented throughout his trial by counsel who met the requirements of § 13A-5-54. Therefore, he was at all times represented by the counsel to which he was entitled, see
 
 Whitehead
 
 and
 
 Robitaille,
 
 supra; thus, there was no basis upon which to declare a mistrial. Accordingly, there was no error, much less plain error, in the trial court’s decision to proceed with the trial of this case on the day one of Sale’s attorneys was ill and unable to attend the trial.
 

 III.
 

 Sales contends that the trial court erred when it denied his motion for a change of venue on the ground of what Sale characterized as “prejudicial press coverage.” (Sale’s brief at p. 17.)
 

 When reviewing a ruling on a motion for a change of venue, we consider the following:
 

 “ ‘ “ ‘A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court’s ruling on a motion for a change of venue will be reversed only when there is a showing
 
 *342
 
 that the trial court has abused its discretion.
 
 Nelson v. State,
 
 440 So.2d 1130 (Ala.Crim.App.1983).’
 

 “ ‘
 
 “Joiner v. State,
 
 651 So.2d 1155, 1156 (Ala.Crim.App.1994).”
 

 “
 
 ‘Clemons v. State,
 
 720 So.2d 961, 977 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999). “The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather,
 
 Ex parte Grayson[,
 
 479 So.2d 76 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity.”
 
 Slagle v. State,
 
 606 So.2d 193, 195 (Ala.Crim.App.1992). “ ‘Moreover, the passage of time cannot be ignored as a factor in bringing objectivity to trial.’ ”
 
 Whisenhant v. State,
 
 555 So.2d 219, 224 (Ala.Crim.App.1988), aff'd, 555 So.2d 235 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990) (citations omitted) (quoting
 
 Dannelly v. State,
 
 47 Ala.App. 363, 254 So.2d 434, cert. denied, 287 Ala. 729, 254 So.2d 443 (1971)).’ ”
 

 Hyde v. State,
 
 [Ms. CR-04-1390, September 28, 2007] — So.3d —, — (Ala.Crim.App.2007), quoting
 
 Samra v. State,
 
 771 So.2d 1108, 1113 (Ala.Crim.App.1999); see also
 
 Jones v. State,
 
 [Ms. CR-05-0527, August 31, 2007] — So.3d — (Ala.Crim.App.2007).
 

 “ ‘ “In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated ‘actual prejudice’ against him on the part of the jurors; 2) when there is ‘presumed prejudice’ resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected.
 
 Sheppard v. Maxwell,
 
 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966);
 
 Rideau [v. Louisiana,
 
 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) ];
 
 Estes v. Texas,
 
 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965);
 
 Ex parte Grayson,
 
 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985);
 
 Coleman v. Zant,
 
 708 F.2d 541 (11th. Cir.1983).”
 

 “
 
 ‘Hunt v. State,
 
 642 So.2d 999, 1042-43 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).’
 

 “Samra v. State,
 
 771 So.2d 1108, 1113 (Ala.Crim.App.1999).”
 

 Hyde,
 
 — So.3d at —.
 

 A claim of actual prejudicial pretrial publicity requires an initial showing that at least one of the jurors who heard the case entertained an opinion that the defendant was guilty before hearing the evidence.
 
 Jones,
 
 — So.3d at —, citing
 
 Irvin v. Dowd,
 
 366 U.S. 717, 727, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Sale makes no such claim in this case, and our review of the record found no evidence of actual prejudice on the part of any juror who was chosen to hear Sale’s case. Instead, Sale asserts a claim of presumed prejudice, contending that information concerning this case, not all of which was accurate, was so widely publicized in the Houston County area that it made it virtually impossible to draw an impartial jury from the Houston County community.
 

 To prove presumed prejudice, Sale had the burden of establishing that prejudicial pretrial publicity so saturated Houston County
 

 “as to have a probable prejudicial impact on the prospective jurors there, thus rendering the trial setting inherently suspect. This required a show
 
 *343
 
 ing that a feeling of deep and bitter prejudice exists in [Houston] County as a result of the publicity.
 
 Holladay v. State,
 
 549 So.2d 122 (Ala.Crim.App.1988), aff'd,
 
 Ex parte Holladay,
 
 549 So.2d 135 (Ala.1989), cert. denied, [498] U.S. [1012], 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).’
 

 “Ex parte Fowler,
 
 574 So.2d 745, 747-48 (Ala.1990).”
 

 Hyde,
 
 — So.3d at —.
 

 In
 
 Hunt v. State,
 
 642 So.2d 999, 1042-43 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994), this Court held that for pretrial publicity to be presumptively prejudicial, the defendant must show: 1) that the pretrial publicity was prejudicial and inflammatory and 2) that the prejudicial pretrial publicity saturated the community where the trial was held. See
 
 Coleman v. Kemp,
 
 778 F.2d 1487 (11th Cir.1985). This Court adopted the
 
 Coleman
 
 definition of the “presumptive prejudice” standard as follows:
 

 “ ‘ “Prejudice is presumed from pretrial publicity when
 
 pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community
 
 where the trials were held.” 778 F.2d at 1490 (emphasis added [in
 
 Hunt
 
 ]). See also
 
 Holladay v. State,
 
 549 So.2d 122, 125 (Ala.Crim.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
 

 “ ‘In determining whether the “presumed prejudice” standard exists the trial court should look at “the totality of the surrounding facts.”
 
 Patton v. Yount,
 
 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984);
 
 Murphy v. Florida,
 
 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975);
 
 Irvin v. Dowd,
 
 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is “rarely” applicable, and is reserved for only “extreme situations.”
 
 Coleman v. Kemp,
 
 778 F.2d at 1537. “In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice.”
 
 Coleman v. Kemp,
 
 778 F.2d at 1490.
 

 “ ‘. “[T]he burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one.”
 
 Coleman v. Kemp,
 
 778 F.2d at 1537. “Prejudicial” publicity usually must consist of much more than stating the charge, and of reportage of the pretrial and trial processes. “Publicity” and “prejudice” are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial.
 

 [[Image here]]
 

 “ ‘. In order to meet the burden of showing the necessity for a change of venue due to pretrial publicity on the grounds of community saturation, “the appellant must show more than the fact ‘that a case generates even widespread publicity.’ ”
 
 Oryang v. State,
 
 642 So.2d 979, 983 (Ala.Crim.App.1993), quoting,
 
 Thompson v. State,
 
 581 So.2d 1216, 1233 (Ala.Crim.App.1991), cert. denied, [502] U.S. [1030], 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
 

 “ ‘ “ ‘Newspaper articles alone would not necessitate a change in venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accu-sational or denunciatory statements, that a fair and impartial trial was impossible.
 
 Patton v. State,
 
 246 Ala. 639, 21 So.2d 844 [1945].’ ”
 

 “
 
 ‘Thompson,
 
 581 So.2d at 1233, quoting
 
 McLaren v. State,
 
 353 So.2d 24, 31 (Ala.Crim.App.), cert. denied, 353 So.2d 35 (Ala.1977).
 

 [[Image here]]
 

 
 *344
 
 . To justify a presumption of prejudice under this standard, the publicity must be both extensive and sensational in nature. If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice.’
 
 United States v. Angiulo,
 
 897 F.2d 1169, 1181 (1st Cir.1990).”
 

 Jones,
 
 — So.3d at —.
 

 In support of his motion for a change of venue, Sale presented evidence regarding the nature and extent of the news coverage of the crime, including footage and scripts of the television news broadcasts and newspaper articles, and the dates and number of times of those broadcasts and publications.
 

 The record shows that news coverage connected with Lynn’s hospitalization, subsequent death, Sale’s arrest, and his pretrial court appearances occurred on about 20 days spanning the two years between the crime and the trial of the case. Even if that coverage constituted widespread publicity, widespread publicity alone does not require a change of venue.
 
 McGahee v. State,
 
 885 So.2d 191, 211 (Ala.Crim.App.2003). Sale did not present evidence regarding the effect, if any, the news broadcasts and publication of the news articles had on members of the Houston County community as far as any opinions they may have formed based upon that coverage or whether Sale was prejudiced by the information. For instance, he presented no evidence regarding how many people in the community actually followed the coverage. There was no evidence as to how many people in the coverage area may have formed an opinion as to Sale’s innocence or guilt or whether members of the community who had followed the coverage would be able to put aside any knowledge they may have had of the case from media sources to give Sale a fair trial. Sale presented no evidence indicating that the media attention given his case so inflamed or saturated the Houston County community that there was an emotional tide against him.
 

 We have carefully examined the evidence Sale presented in support of his motion for change of venue. Sale is correct in his assertion that the media reports ed a statement attributed to Houston County Sheriff Lamar Glover and to investigators in the case that Lynn “had apparently been tied up so tightly for so long that gangrene had developed in her hands and feet.” (CR. 421-24, see also, 425^46, 448-50.) Whether Lynn’s gangrene was the result of being tightly bound was not proven at trial. Despite the reporting of what may have been an incorrect conclusion drawn by law-enforcement officials as to the cause of Lynn’s development of gangrene, the fact remains that she did develop the condition as a result of Sale’s conduct toward her.
 

 A review of the substance of the news reports related to Lynn’s injuries and death and Sale’s arrest and the subsequent proceedings against him show that those reports were essentially factual and objective rather than accusatory, inflammatory, or sensational. Thus, Sale has not shown that the pretrial publicity in this case was so inherently or presumptively prejudicial as to constitute one of those “extreme situations” that warrant a presumption of prejudice from pretrial publicity.
 

 TV.
 

 Because Sale has been sentenced to death, this Court must review the underlying proceedings for plain error. Rule 45A, Ala. R.App. P., states:
 

 “In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error
 
 *345
 
 or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
 

 As mentioned above, when discussing the application of the plain-error standard of review, this Court has stated:
 

 “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in
 
 United States v. Young,
 
 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See
 
 Ex parte Price,
 
 725 So.2d 1068 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999);
 
 Burgess v. State,
 
 723 So.2d 742 (Ala.Crim.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999);
 
 Johnson v. State,
 
 620 So.2d 679, 701 (Ala.Crim.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Crim.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
 

 Hall v. State,
 
 820 So.2d 113, 121-22 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001). Although the failure to object will not preclude our review, it will weigh against any claim of prejudice. See
 
 Dill v. State,
 
 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992).
 

 Our review of the record revealed two errors made during the trial court’s charge to the jury — one during the guilt phase and the other during the penalty phase— that must be addressed.
 

 A.
 

 During the trial court’s charge during the guilt phase of Sale’s trial, the trial court instructed the jury on the lesser-included offense of felony murder, § 13A-6-2(a)(3), Ala.Code (1975), as follows:
 

 “The lesser-included under capital murder is murder, and these are the elements: A person commits the crime of murder if he or she commits kidnapping in the first or second degree: number one, in the course of the crime; number two, in the furtherance of the crime; or, number three, in the immediate flight from the crime he is committing, he or another participant caused the death of any person.
 

 “To convict, the State must prove beyond a reasonable doubt each of the following elements of murder: number one, that Lynn Michelle Sale is dead; number two, that Michael Lynn Sale caused the death of Lynn Michelle Sale by
 
 recklessly
 
 depriving her of medical attention when she was in need of it due to sepsis; number three, in committing the acts which caused the death of Lynn Michelle Sale, Michael Lynn Sale acted in the course of and in furtherance of the crime of kidnapping in the first degree, or in immediate flight from it; and, number four, in doing the acts which constituted the commission of kidnapping in the first degree, (a) during the course of which, (b) in furtherance of which, or, (c) in immediate flight from which the death of Lynn Michelle Sale was caused by Michael Lynn Sale.”
 

 (R. 953-54; emphasis added.)
 

 The trial court initially correctly stated the law regarding the elements of felony
 
 *346
 
 murder, as that offense is defined by § 13A-6-2(a)(3). In instructing the jury that, to find Sale guilty of felony murder, it must find that Sale “recklessly” caused Lynn’s death by depriving her of needed medical attention, the trial court not only incorrectly inserted a
 
 mens rea
 
 element into what must be proven to sustain a conviction for felony murder, but it also appeared to confuse the offense of reckless murder with the offense of manslaughter.
 

 Felony murder does not require the specific intent to kill; it requires only the intent to commit the underlying felony. § 13A-6-2(a)(3), Ala.Code 1975;
 
 Heard v. State,
 
 999 So.2d 992 (Ala.2007); and
 
 Mitchell v. State,
 
 706 So.2d 787 (Ala.Crim.App.1997).
 

 “The absence of an intent to kill,
 
 however, is not necessarily an element of felony murder, as contrasted with the intent to kill, which is an element of capital murder. In other words, a felony-murder conviction does not require proof that the defendant unintentionally killed the victim, only that the defendant intended to commit the underlying felony.”
 

 Heard,
 
 999 So.2d at 1005 (emphasis in original).
 

 In setting forth the elements of the lesser-included offense of felony murder, the trial court instructed the jury that, to convict Sale of felony murder, it must find that he recklessly caused Lynn’s death, plus kidnapping. Reckless murder is not the same offense as felony murder.
 

 “A person commits the offense of reckless murder if, ‘[ujnder circumstances manifesting extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to a person other than himself, and thereby causes the death of another person.’ § 13A-6-2(a)(2), Ala. Code (1975). A charge on reckless murder is not appropriate where the acts resulting in death are directed toward one or more particular people, as was the case here, rather than toward human life in general.
 
 Parker v. State,
 
 587 So.2d 1072 (Ala.Crim.App.1991);
 
 McLaughlin v. State,
 
 586 So.2d 267 (Ala.Crim.App.1991);
 
 Walker v. State,
 
 523 So.2d 528 (Ala.Crim.App.1988);
 
 Ex parte McCormack,
 
 431 So.2d 1340 (Ala.1983);
 
 Northington v. State,
 
 413 So.2d 1169 (Ala.Crim.App.1981), writ quashed, 413 So.2d 1172 (Ala.1982).”
 

 Dunaway v. State,
 
 746 So.2d 1021,1034-35 (Ala.Crim.App.1998). Because Sale’s conduct was directed solely toward Lynn, the lesser-included offense of reckless murder would not apply in this case, and the trial court erred in instructing jurors that, to find Sale guilty of murder, they had to find that he acted recklessly.
 

 If the jury determined that Sale caused Lynn’s death because he acted recklessly, then the appropriate offense with which to convict him would have been the lesser-included offense of manslaughter. A person commits manslaughter if he recklessly causes the death of another. § 13A-6-3(a)(1). The trial court did instruct the jury on manslaughter.
 

 We find that the trial court erred in instructing the jury that, to convict Sale of felony murder it had to find that he recklessly caused Lynn’s death. In fact, the trial court’s instruction on murder appeared to erroneously meld elements of three separate offenses—felony murder, reckless murder, and manslaughter. However, our analysis does not end here.
 

 Rule 45, Ala. RApp. P., provides:
 

 “No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper ad
 
 *347
 
 mission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”
 

 In addition, this court has stated:
 

 “ ‘After finding error, an appellate court may still affirm a conviction on the ground that the error was harmless, if indeed it was.’
 
 Guthrie v. State,
 
 616 So.2d 914, 931 (Ala.Crim.App.1993), citing
 
 Chapman v. California,
 
 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). ‘The harmless error rule applies in capital cases.’
 
 Knotts v. State,
 
 686 So.2d 431, 469 (Ala.Crim.App.1995), opinion after remand, 686 So.2d 484 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997), citing
 
 Ex parte Whisenhant,
 
 482 So.2d 1241 (Ala.1983). ‘In order for a constitutional error to be deemed harmless under
 
 Chapman,
 
 the state must prove beyond a reasonable doubt that the error did not contribute to the verdict. In order for the error to be deemed harmless under Rule 45, the state must establish that the error did not injuriously affect the appellant’s substantial rights.’
 
 Coral v. State,
 
 628 So.2d 954, 973 (Ala.Crim.App.1992), opinion after remand, 628 So.2d 988 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). ‘The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing.’
 
 Davis v. State,
 
 718 So.2d 1148, 1164 (Ala.Crim.App.1997), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999).”
 

 McNabb v. State,
 
 887 So.2d 929, 976-77 (Ala.Crim.App.2001).
 

 Here, the trial court began by instructing the jury on the offense of murder made capital because it occurred during the course of kidnapping in the first or second degree. The court told jurors that if they did not find that Sale intentionally murdered Lynn during a kidnapping, they could not find him guilty of capital murder, but that they could then consider lesser-included offenses. In addition to the instruction, albeit erroneous, on the lesser-included offense of felony murder, the trial court properly instructed the jury on intentional murder, manslaughter, criminally negligent homicide, and, if jurors did not believe Sale was culpable for Lynn’s death but was culpable for kidnapping only, kidnapping in the first degree.
 

 The jury rejected each of the properly stated lesser-included charges to capital murder, which ran the gamut from an intentional killing that did not occur during the commission of a kidnapping to kidnapping alone. Given the range of possibilities the jury had before it, the jury’s verdict of capital murder makes clear that it determined that Sale intentionally caused Lynn’s death and that her death occurred during the course of a kidnapping in the first degree. Therefore, the court’s failure to charge the jury that felony murder does not require the defendant to intend to cause the victim’s death during the course of committing a separate felony did not injure Sale’s substantial rights. Accordingly, the error was harmless. See, e.g.,
 
 Lewis v. State,
 
 889 So.2d 623, 688 (Ala.Crim.App.2003) (any error in charges as to lesser-included offenses was harmless because the jury was charged on the lesser-included offenses of intentional murder,
 
 *348
 
 felony murder, and manslaughter, and the jury found Lewis guilty of the greater capital offenses);
 
 Baker v. State,
 
 906 So.2d 210 (Ala.Crim.App.2001) (the trial court’s failure to charge the jury on reckless murder and felony murder was, at most, harmless error, where the jury was charged on capital murder, intentional murder, reckless manslaughter, and heat-of-passion manslaughter, and the jury found the defendant guilty of capital murder), rev’d on other grounds, 906 So.2d 277 (Ala.2004);
 
 Smith v. State,
 
 756 So.2d 892 (Ala.Crim.App.1997), aff'd, 756 So.2d 957 (Ala.2000) (the trial court’s failure to charge the jury on reckless manslaughter was not error, but, even if it was, it was harmless error, where the jury was charged on capital murder, intentional murder, and robbery, and the jury found the defendant guilty of capital murder); and
 
 Brown v. State,
 
 623 So.2d 416 (Ala.Crim.App.1993) (the trial court’s failure to charge the jury on lesser-included offenses was, at most, harmless error, where the jury was charged on capital murder and felony murder and the jury found the defendant guilty of capital murder).
 

 B.
 

 The trial court also gave an erroneous charge during the penalty phase of the trial. During the course of its instructions regarding the requirement that jurors weigh the aggravating circumstances that were proven against the mitigating circumstances when determining whether to recommend the death sentence or a sentence of life in prison without the possibility of parole, the trial court stated:
 

 “The law also provides which of these two punishments [death or life imprisonment without the possibility of parole] should be imposed upon the defendant depends on whether any aggravating circumstance or circumstances exist, and, if so, whether these aggravating circumstance or circumstances outweigh the mitigating circumstances.
 

 “However, if after a full and fair consideration of all the evidence in the case, you determine that the mitigating circumstances outweigh any aggravating circumstance that exists, your verdict would be punishment for life imprisonment without parole.”
 

 (R. 1113-14.)
 

 This instruction improperly states that the jury had to find that the mitigating circumstances had to outweigh the aggravating circumstances before it could return a verdict recommending a sentence of life in prison without the possibility of parole. It does not provide any guidance to jurors regarding what the verdict should be if they find that the mitigating circumstances and the aggravating circumstances are of equal weight.
 

 Sale did not object to these instructions, and on appeal, he does not contend that the instructions as set forth above constituted error. Therefore, we review these instructions for plain error, that is, an error that “ ‘ “seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.” ’ ”
 
 Ex parte Davis,
 
 718 So.2d 1166, 1174 (Ala.1998), quoting
 
 Kuenzel v. State,
 
 577 So.2d 474, 489 (Ala.Crim.App.1990), quoting in turn
 
 United States v. Butler,
 
 792 F.2d 1528, 1535 (11th Cir.1986).
 

 Alabama’s death-penalty statutory scheme provides that “[i]f the jury determines that one or more aggravating circumstances as defined by Section 13A-5-49 exist
 
 but do not outweigh the mitigating circumstances,
 
 it shall return an advisory verdict recommending to the trial court that the penalty be life imprisonment without parole.” § 13A-5^16(e)(2), Ala. Code 1975 (emphasis added). By providing that if the aggravating circumstances
 
 *349
 
 do not outweigh the mitigating circumstances, the statute encompasses those situations in which the jury determines that the aggravating circumstances and the mitigating circumstances are equally balanced.
 

 The trial court’s instruction to the jury in this case, however, stated only that a verdict recommending a punishment of life imprisonment without the possibility of parole would be appropriate if the mitigating circumstances outweighed the aggravating circumstances. The instructions did not provide the jury with any guidance as to the proper verdict if it found that the aggravating circumstances and the mitigating circumstances were equally balanced.
 

 The Alabama Supreme Court addressed this issue in
 
 Ex parte McNabb,
 
 887 So.2d 998 (Ala.2004). In that case, the trial court instructed the jury as follows during the sentencing phase of the trial:
 

 “[I]f, after a full and fair consideration of all of the evidence in the case, you are convinced beyond a reasonable doubt that at least one aggravating circumstance does exist and you are convinced that the aggravating circumstance outweighs the mitigating circumstances, then your verdict would be: ‘We, the jury, recommend that the defendant be punished by death, and the vote is as follows .... ’ However, if after a full and fair consideration of all of the evidence in this case, you determine that the mitigating circumstances outweigh any aggravating circumstance or circumstances that exist, or you are not convinced beyond a reasonable doubt that at least one aggravating circumstance does exist, your verdict should be to recommend the punishment of life imprisonment without parole.... ”
 

 McNabb,
 
 887 So.2d at 1001. Thus, just as in this case, the language used in instruet-ing the jury in
 
 McNabb
 
 did not specifically instruct the jury on what to do if the aggravating circumstances and mitigating circumstances were in balance.
 

 The Alabama Supreme Court held that although the trial court did not instruct the jury as to what to do when the mitigating circumstances and the aggravating circumstances were in balance, “the jury [in
 
 McNabb
 
 ] was not invited to recommend a sentence of death without finding any aggravating circumstance.”
 
 Id.
 
 at 1004. The Supreme Court then held that, in considering the jury charge in its entirety, it could not conclude that “the error ‘seriously affect[ed] the fairness, integrity or public reputation of [these] judicial proceedings,’
 
 Ex parte Davis,
 
 718 So.2d at 1173-74, so as to require a reversal of the sentence.”
 
 McNabb,
 
 887 So.2d at 1004.
 

 After reviewing the trial court’s charge to the jury during the penalty phase in this case, we likewise cannot conclude that the trial court’s failure to instruct the jury as to what to do if the aggravating circumstances and the mitigating circumstances were equally balanced seriously affected the fairness, integrity or public reputation of this trial. When charging the jury regarding mitigating circumstances and the weight to be given to them, the court should reiterate that the aggravating circumstances must outweigh the mitigating circumstances in order for a juror to vote to return a verdict recommending death, and that if the aggravating circumstances do not outweigh the mitigating circumstances, which would encompass a situation in which the weight of the aggravating circumstances are equal to the weight of the mitigating circumstances, then a vote recommending life without parole would result. This would make clear to the jury that, in those instances when the mitigating circumstances and the aggravating circumstances are
 
 *350
 
 equally balanced, a verdict recommending the death penalty would not be appropriate.
 

 We have searched the record for any error that may have adversely affected Sale’s substantial rights and have found none. Therefore, we find no basis for reversal under the plain-error standard of review as to either the guilt or penalty phases of Sale’s trial. See Rule 45A, Ala.R.App. P.
 

 V.
 

 Pursuant to § 13A-5-53, Ala.Code 1975, we are required to address the propriety of Sale’s conviction and sentence of death. Section 13A-5-53, Ala.Code 1975, requires that we review the propriety of Sale’s death sentence to determine whether any error adversely affecting his rights occurred in the sentence proceedings; whether the trial court’s findings concerning the aggravating and mitigating circumstances were supported by the evidence; and whether death is the appropriate sentence in the case. In determining whether death is the proper sentence, we must determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; whether an independent weighing by this Court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
 

 After evidence was presented to the jury during the penalty phase of Sale’s trial, the jury unanimously voted to recommend that Sale be sentenced to death. The jury returned a special verdict form indicating that the jurors had unanimously found the existence of three aggravating circumstances: (1) that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses; (2) that the capital offense was committed by Sale under a sentence of imprisonment; and (3) Sale intentionally killed Lynn during a kidnapping in the first degree.
 

 Pursuant to § 13A-5^47, Ala.Code 1975, the trial court held a subsequent sentencing hearing to aid it in determining whether it would sentence Sale to death or to life imprisonment. In its sentencing order, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, and any nonstatutory mitigating circumstance found to exist under § 13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense and Sale’s participation in it.
 

 In its findings, the trial court found the existence of the following statutory aggravating circumstances: (1) that Sale intentionally killed Lynn during a kidnapping in the first degree; (2) that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses; and (3) that the capital offense was committed by Sale while he was under a sentence of imprisonment.
 

 The trial court found that no statutory mitigating circumstances existed in this case. It did, however, find a number of nonstatutory mitigating circumstances, including the following:
 

 (1) Sale’s father left the family when Sale was young.
 

 (2) Sale was emotionally traumatized by his father’s departure.
 

 (3) Because Sale’s father left the family, his mother had to take on a full-time job and cease being a full-time homemaker.
 

 
 *351
 
 (4) Sale’s mother’s work outside the home “deprived Michael Sale and his brothers and sisters of their mother’s nurture.” (CR. 360.)
 

 (5) Sale’s father rejected his attempt to reestablish an emotional bond.
 

 (6) Sale was in special-education classes when he was in school.
 

 (7) Sale has borderline intellectual function.
 

 (8) Sale’s first stepfather was an alcoholic.
 

 (9) Sale was traumatized by the death of his brother.
 

 (10) Sale never received grief counseling over the death of his brother.
 

 (11) Sale had had a long-term marriage.
 

 (12) Sale helped to rear and support two sons.
 

 (13) Sale ran two successful businesses.
 

 (14) Sale made a good impression on customers.
 

 (15) Sale became dependent upon methamphetamine.
 

 (16) Sale attempted to give Lynn food and liquids when she needed during her final days at home.
 

 (17) Sale gave up the right to be silent when questioned by law enforcement.
 

 (18) Sale behaved appropriately during the trial.
 

 (19) Society would be adequately protected by Sale’s serving a sentence of life imprisonment without the possibility of parole.
 

 (20) Sale is a human being.
 

 (21) Any other circumstances arising from the evidence.
 

 The trial court’s sentencing order reflects that after considering the jury’s advisory verdict, and after weighing the aggravating circumstances against the mitigating circumstances, the trial court found that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced Sale to death.
 

 Sale was convicted of murder made capital because it occurred during the course of a kidnapping, a violation of § 13A-5-40(a)(1), Ala.Code 1975. He abused his wife, Lynn, and kept her sequestered for about a month, causing her physical condition to deteriorate so completely that she was near death when she was taken to the hospital on May 3, 2004. When she was admitted to the hospital, Lynn was in renal failure and respiratory failure. She died at the hospital about two weeks later, on May 17.
 

 Evidence showed that as a combination of injuries Lynn received from Sale and the filthy conditions in which he kept her, Lynn developed the blood infection sepsis, which, in turn, caused her to develop gangrene in her extremities and her nose. As her condition deteriorated, Sale continued to administer beatings, as evidenced by the fresh bruises, cuts, bite marks and the broken rib Lynn had when she was brought to the hospital. Medical tests showed that, in addition to the beatings Sale had inflicted on Lynn while Sale was holding her captive, she had suffered strokes and a heart attack.
 

 Despite Lynn’s poor condition, Sale did not seek medical help for her until it was apparent she would not live. Rather than help Lynn, Sale instructed his son to keep a diary of her deteriorating condition. Sale’s brutal treatment of Lynn was meant to punish her because she had had him prosecuted for abuse in the past and, while he was incarcerated, Sales had lost money and his flooring business had taken a downturn.
 

 The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice,
 
 *352
 
 or any other arbitrary factor. See § 13A-5-53(b)(l), Ala.Code 1975. Furthermore, after weighing independently the aggravating circumstances and the mitigating circumstances, this Court finds that the aggravating circumstances outweigh the mitigating circumstance, and we are convinced that death was the appropriate punishment in this case.
 

 As required by § 13A-5-53(b)(3), Ala. Code 1975, we must determine whether Sale’s sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. Sale committed the murder of his wife during the course of a kidnapping. His sentence was not disproportionate or excessive when compared to penalties imposed in similar cases. See
 
 Lewis v. State,
 
 [Ms. CR-03-0480, November 2, 2007] — So.3d —, — (Ala.Crim.App.2007);
 
 Eatmon v. State,
 
 992 So.2d 64 (Ala.Crim.App.2007);
 
 Flowers v. State,
 
 922 So.2d 938 (Ala.Crim.App.2005);
 
 Eggers v. State,
 
 914 So.2d 883 (Ala.Crim.App.2004);
 
 Ziegler v. State,
 
 886 So.2d 127 (Ala.Crim.App.2003);
 
 Smith v. State,
 
 838 So.2d 413 (Ala.Crim.App.2002);
 
 Ex parte Broadnax,
 
 825 So.2d 233 (Ala.2001);
 
 Ex parte Grayson,
 
 824 So.2d 844 (Ala.2001);
 
 Smith v. State,
 
 797 So.2d 503 (Ala.Crim.App.2000); and
 
 Ingram v. State,
 
 779 So.2d 1225 (Ala.Crim.App.1999).
 

 For the reasons set forth above, Sale’s conviction and sentence of death by lethal injection are affirmed.
 

 AFFIRMED.
 

 BASCHAB, P.J., and McMILLAN and WISE, JJ., concur.
 

 SHAW, J., concurs in the result.